## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERDIGITAL COMMUNICATIONS, INC., a Delaware corporation, INTERDIGITAL TECHNOLOGY CORPORATION, a Delaware corporation, IPR LICENSING, INC., a Delaware corporation, and INTERDIGITAL HOLDINGS, INC., a Delaware corporation, | C.A. No. 13-009-RGA |
| Plaintiffs | **JURY TRIAL DEMANDED** |
| v. | |
| ZTE CORPORATION, a Chinese corporation, and ZTE (USA) INC., a New Jersey corporation, | |
| Defendants. | |

## ZTE (USA) INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFFS' AMENDED COMPLAINT

Defendant ZTE (USA) Inc. ("ZTE (USA)") hereby submits this Answer with Counterclaims to the Amended Complaint filed by Plaintiffs InterDigital Communications, Inc., InterDigital Technology Corporation, IPR Licensing, Inc., and InterDigital Holdings, Inc., (collectively "InterDigital" or "the Plaintiffs"). (D.I. 26.) ZTE (USA) responds as follows:

### THE PARTIES

1.     ZTE (USA) admits on information and belief the allegations contained in paragraph 1.

2.     ZTE (USA) admits on information and belief the allegations contained in paragraph 2.

3.     ZTE (USA) admits on information and belief the allegations contained in paragraph 3.

4.      ZTE (USA) admits on information and belief the allegations contained in paragraph 4, except the allegations in footnote 1, for which ZTE (USA) lacks knowledge or information sufficient to form a belief about the truth thereof, and therefore denies the same.

5.      ZTE (USA) admits the allegations of paragraph 5.

6.      ZTE (USA) admits the allegations of paragraph 6.

## JURISDICTION AND VENUE

7.      ZTE (USA) admits that Plaintiffs purport to bring this action under 35 U.S.C. § 271 et seq.  ZTE (USA) further admits that this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

8.      ZTE (USA) does not contest venue in this District solely for the purposes of this case.  ZTE (USA) further does not contest that the Court has personal jurisdiction over ZTE (USA) solely for the purposes of this case.  All remaining allegations of paragraph 8 are denied.

9.      ZTE (USA) does not contest venue in this District solely for the purposes of this case.  ZTE (USA) further does not contest that the Court has personal jurisdiction over ZTE (USA) solely for the purposes of this case.  All remaining allegations of paragraph 9 are denied.

## THE PATENTS-IN-SUIT

10.      ZTE (USA) admits that Plaintiffs purport that there are four patents at issue in this action, that is, United States Patent Nos. 7,190,966 ("the '966 patent"), 7,286,847 ("the '847 patent"), 7,941,151 ("the '151 patent"), and 8,380,244 ("the '244 patent").

11.      ZTE (USA) admits that the '966 patent appears to be entitled "Method and Apparatus For Performing An Access Procedure."  ZTE (USA) further admits the '966 patent appears to have been issued on March 13, 2007, naming inventors Fatih Ozluturk and Gary R. Lomp.  ZTE (USA) lacks knowledge or information sufficient to form a belief as to whether InterDigital owns by assignment the entire right, title, and interest in and to the '966 patent, but

2

ZTE (USA) admits that InterDigital is listed as the assignee on the face of the '966 patent.  ZTE (USA) admits that Exhibit A to the Amended Complaint appears to contain a copy of the '966 patent.  ZTE (USA) denies that the '966 patent is valid and enforceable.

12.     ZTE (USA) admits that the '847 patent appears to be entitled "Method and Apparatus For Performing An Access Procedure."  ZTE (USA) further admits the '847 patent appears to have been issued on October 23, 2007, naming inventors Fatih Ozluturk and Gary R. Lomp.  ZTE (USA) lacks knowledge or information sufficient to form a belief as to whether InterDigital owns by assignment the entire right, title, and interest in and to the '847 patent, but ZTE (USA) admits that InterDigital is listed as the assignee on the face of the '847 patent.  ZTE (USA) admits that Exhibit B to the Amended Complaint appears to contain a copy of the '847 patent.  ZTE (USA) denies that the '847 patent is valid and enforceable.

13.     ZTE (USA) admits that the '151 patent appears to be entitled "Method and System For Providing Channel Assignment Information Used to Support Uplink And Downlink Channels."  ZTE (USA) further admits the '151 patent appears to have been issued on May 10, 2011, naming inventors Marian Rudolf, Stephen G. Dick, and Phillip J. Pietraski.  ZTE (USA) lacks knowledge or information sufficient to form a belief as to whether InterDigital owns by assignment the entire right, title, and interest in and to the '151 patent, but ZTE (USA) admits that InterDigital is listed as the assignee on the face of the '151 patent.  ZTE (USA) admits that Exhibit C to the Amended Complaint appears to contain a copy of the '151 patent.  ZTE (USA) denies that the '151 patent is valid and enforceable.

14.     ZTE (USA) admits that the '244 patent appears to be entitled "Dual Mode Unit for Short Range, High Rate and Long Range, Lower Rate Data Communications."  ZTE (USA) further admits the '244 patent appears to have been issued on February 19, 2013, naming

3

inventor Thomas E. Gorsuch.  ZTE (USA) lacks knowledge or information sufficient to form a belief as to whether IPR Licensing, Inc. owns by assignment the entire right, title, and interest in and to the '244 patent, but ZTE (USA) admits that IPR Licensing, Inc. is listed as the assignee on the face of the '244 patent.  ZTE (USA) admits that Exhibit D to the Amended Complaint appears to contain a copy of the '244 patent.  ZTE (USA) denies that the '244 patent is valid and enforceable.

**COUNT I**
**INFRINGEMENT OF THE '966 PATENT**

15.    ZTE (USA) reasserts its answers to paragraphs 1-14 above as if fully set forth herein.

16.    ZTE (USA) denies the allegations of paragraph 16.

17.    ZTE (USA) admits that InterDigital asserted patents against ZTE (USA) in Investigation Number 337-TA-800 before the U.S. International Trade Commission.  ZTE (USA) admits that it has received the Amended Complaint.  ZTE denies the remaining allegations of paragraph 17.

18.    ZTE (USA) admits that at least some of the accused ZTE (USA) products identified by InterDigital to date are designed to be used in a 3G WCDMA system.  ZTE (USA) denies the remaining allegations in paragraph 18.

19.    ZTE (USA) denies the allegations in paragraph 19.

20.    ZTE (USA) denies the allegations in paragraph 20.

21.    ZTE (USA) denies the allegations in paragraph 21.

**COUNT II**
**INFRINGEMENT OF THE '847 PATENT**

22.    ZTE (USA) reasserts its answers to paragraphs 1-21 above as if fully set forth herein.

4

23.     ZTE (USA) denies the allegations in paragraph 23.

24.     ZTE (USA) admits that InterDigital asserted patents against ZTE (USA) in Investigation Number 337-TA-800 before the U.S. International Trade Commission.   ZTE (USA) admits that it has received the Amended Complaint.  ZTE (USA) denies the remaining allegations of paragraph 24.

25.     ZTE (USA) admits that at least some of the accused ZTE (USA) products identified by InterDigital to date are designed to be used in a 3G WCDMA system.  ZTE (USA) denies the remaining allegations of paragraph 25.

26.     ZTE (USA) denies the allegations of paragraph 26.

27.     ZTE (USA) denies the allegations of paragraph 27.

28.     ZTE (USA) denies the allegations of paragraph 28.

## COUNT III
## INFRINGEMENT OF THE '151 PATENT

29.     ZTE (USA) reasserts its answers to paragraphs 1-28 above as if fully set forth herein.

30.     ZTE (USA) denies the allegations of paragraph 30.

31.     ZTE (USA) admits that it has received the Amended Complaint.  ZTE (USA) denies the remaining allegations in paragraph 31.

32.     ZTE (USA) admits that at least some of the accused ZTE (USA) products identified by InterDigital to date are designed to be used in a 4G wireless communications system and to comply with the LTE standard.  ZTE (USA) denies the remaining allegations in paragraph 32.

33.     ZTE (USA) denies the allegations of paragraph 33.

34.     ZTE (USA) denies the allegations of paragraph 34.

35.     ZTE (USA) denies the allegations of paragraph 35.

**COUNT IV**
**INFRINGEMENT OF THE '244 PATENT**

36.     ZTE (USA) reasserts its answers to paragraphs 1-35 above as if fully set forth herein.

37.     ZTE (USA) denies the allegations of paragraph 37.

38.     ZTE (USA) admits it received an email from counsel for InterDigital on March 5, 2013 regarding the '244 patent. ZTE further admits that it has received the Amended Complaint.

39.     ZTE (USA) admits that at least some of the accused ZTE (USA) products identified by InterDigital to date are designed to be used in a 3G WCDMA or CDMA2000 system as well as in an IEEE 802 system.   ZTE (USA) denies the remaining allegations in paragraph 39.

40.     ZTE (USA) denies the allegations of paragraph 40.

41.     ZTE (USA) denies the allegations of paragraph 41.

42.     ZTE (USA) denies the allegations of paragraph 42.

**JURY DEMAND**

43.     The allegations in paragraph 43 do not require a response.  ZTE (USA) demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

44.     ZTE (USA) denies that InterDigital is entitled to any relief.

**AFFIRMATIVE DEFENSES**

ZTE (USA) asserts the following affirmative and other defenses listed below.  ZTE (USA) reserves the right to seek to amend, modify, and/or expand these defenses and to take further positions that are consistent with the facts discovered in this case.

6

### First Affirmative Defense:
### Non-Infringement

1.      ZTE (USA) does not infringe any valid and enforceable claim of the Asserted Patents.  ZTE (USA) does not practice any asserted claims of the Asserted Patents.

### Second Affirmative Defense:
### Invalidity

2.      The asserted claims of the Asserted Patents are invalid for failure to meet the conditions of patentability set forth in 35 U.S.C. §§ 101,102, 103, and/or 112.

### Third Affirmative Defense:
### Prosecution Laches

3.      InterDigital's claims are barred in whole or in part by delay in prosecuting the patent applications that matured into the Asserted Patents.

4.      One or more of the Asserted Patents claims benefit under 35 U.S.C. § 120 to an application having a purported filing date of more than ten years before the date InterDigital instituted this action.

5.      InterDigital, based on its representations that one or more of the Asserted Patents claim benefit under 35 U.S.C. § 120 to a series of continuation applications, could have claimed the subject matter now recited in the asserted claims of one or more of the Asserted Patents at any time since the respective, purported effective filing date(s) the Asserted Patent(s).

### Fourth Affirmative Defense:
### Prosecution History Estoppel

6.      By reason of acts, admissions, and statements before the USPTO made by or on behalf of applicants for the Asserted Patents during prosecution of the patent applications that matured into the Asserted Patents, InterDigital is estopped from claiming ZTE (USA) infringes one or more of the Asserted Patents.

7

### Fifth Affirmative Defense:
**Patent Misuse**

7.     On information and belief, InterDigital is barred from asserting the Asserted Patents by the equitable doctrine of patent misuse.  InterDigital is a member of the relevant standards-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), the 3rd Generation Partnership Project ("3GPP"), and the International Telecommunications Union ("ITU").  The Intellectual Property Rights Policies ("IPR Policies") of these SSOs require each member to identify all patents the member holds that may be essential to compliance with a proposed technology standard and state whether it will license such patents on fair, reasonable and non-discriminatory ("FRAND") terms and conditions.  Having declared to the SSOs that the Asserted Patents are essential to standards, InterDigital failed to comply with their obligations under the IPR Policies, including by failing to propose FRAND terms for the Asserted Patents it claims are essential and by seeking injunctive and/or exclusionary relief against ZTE (USA), a willing licensor.

### Sixth Affirmative Defense:
**Breach of Contract**

8.     InterDigital breached its undertakings and obligations to SSOs including ETSI, 3GPP, and ITU, as well as to ZTE (USA) as beneficiary of such undertakings and obligations, by seeking to enjoin or exclude ZTE (USA) from importing or selling products that allegedly practice the Asserted Patents, and by failing to offer and grant FRAND terms and conditions for licensing the Asserted Patents.

### Seventh Affirmative Defense:
**Equitable and Promissory Estoppel**

9.     InterDigital's claims are barred in whole or in part based on equitable and/or promissory estoppel arising from InterDigital's participation in SSOs including ETSI, 3GPP, and

ITU, InterDigital's failure to propose FRAND terms for the Asserted Patents it claims are essential as required by the SSOs' IPR Policies, ZTE (USA)'s reliance on InterDigital's obligation to adhere to the IPR Policies, and ZTE (USA)'s detriment as a result of InterDigital's failure to honor its obligation.

### Eighth Affirmative Defense:
### Unclean Hands

10.    The Asserted Patents are void and unenforceable by reason of the equitable doctrine of unclean hands based (among other things) on InterDigital's participation in SSOs including ETSI, 3GPP, and ITU, InterDigital's failure to comply with its commitments and obligations under the IPR Policies of these SSOs, InterDigital's efforts to enjoin or exclude ZTE (USA) from importing and selling products that allegedly practice the Asserted Patents, and InterDigital's refusal to offer FRAND terms for the Asserted Patents it claims are essential.

### Ninth Affirmative Defense:
### Express or Implied License

11.    InterDigital is barred from asserting the Asserted Patents because ZTE (USA) is expressly or impliedly licensed to practice the Asserted Patents as a result of InterDigital's participation in SSOs including ETSI, 3GPP, and ITU, its commitments and obligations under the IPR Policies of these SSOs to license the Asserted Patents according to FRAND terms and conditions, and ZTE (USA)'s willingness to enter into a license on FRAND terms and conditions.

### Tenth Affirmative Defense:
### Inequitable Conduct

12.    On information and belief, as alleged below, the '151 Patent, including all of the claims asserted against ZTE (USA), is unenforceable under the doctrine of inequitable conduct.

13.     In particular, during prosecution of the '151 Patent, at least two of the three named inventors, Marian Rudolf and Stephen Dick, deliberately withheld printed publications demonstrating that the subject matter of one or more claims of the '151 Patent was invented earlier by other participants in the organization responsible for developing the LTE cellular standard.  If those publications had been disclosed to the Patent and Trademark Office (PTO), as required by rules of PTO practice, one or more claims of the '151 Patent would not have been allowed.

14.     Marian Rudolf, Stephen Dick and Phillip J. Pietraski are listed as inventors on the '151 Patent.

15.     The '151 Patent claims priority to a provisional application filed on Nov. 18, 2003.

16.     InterDigital Technology Corporation is identified as the assignee on the face of the '151 Patent.

17.     Cellular standards, such as the LTE standard that InterDigital accuses of infringing the '151 Patent, are developed by "Standards-Setting Organizations" (SSOs), made up of participants from companies, such as InterDigital and the Respondents in this investigation, that do business in the cellular space.

18.     Cellular standards are complex, and govern many aspects of the operation of cellular devices and cellular network equipment.  Each section of a standard is developed by a "working group" with expertise in the technical field for that section.  For example, certain working groups have expertise in the efficient use of the radio frequency spectrum, and contribute to the portions of the standard that include the RF specification.  Other working

groups have expertise in other areas, such as the way in which data is encoded for accurate and efficient transmission over the air.

19.    The working group responsible for developing the portion of the LTE standard accused of infringing the '151 Patent is called TSG Radio Access Network Working Group 1 ("TSG-RAN Working Group 1", hereinafter referred to as the "working group") and the group met on multiple occasions in 2002 and 2003 to discuss proposals for the standard under development at the time (high-speed uplink packet access).    Prior to each such discussion, the members of the working group drafted written submissions outlining their proposals.    Those submissions were distributed to all of the members of the working group, including representatives from InterDigital and at least two of the named inventors on the '151 Patent, Marian Rudolf and Stephen Dick.

20.    Two of the named inventors, Marian Rudolf and Stephen Dick, also attended many of the Working Group 1 meetings that occurred just before the '151 Patent's claimed priority date.    Marian Rudolf attended Working Group 1 meetings held on October 8, 2002, November 5, 2002, January 7, 2003, February 18, 2003, May 19, 2003, August 25, 2003, October 6, 2003, and November 7, 2003.  *See* Exhibits A-H.  Stephen Dick attended Working Group 1 meetings on October 8, 2002, November 5, 2002, August 25, 2003, and November 7, 2003.  *See* Exhibits A, B, F, H.

21.    One of the issues addressed by Working Group 1 was how to efficiently assign network resources to multiple cellular devices, all of which need to send and receive data.  *See* Exhibit I.

22.    A cellular network shares the available transmission "bandwidth" (i.e., the network's capacity for sending and receiving data) among multiple cellular devices.    The

11

allocation of bandwidth is under the control of the cellular network; when a cellular telephone wants to send and receive data such as emails or text messages, it must first ask the network for a share of the available bandwidth.

23.     The network responds to the cellular telephone's request for bandwidth by sending messages on a special "channel" that is dedicated to sending "control" messages to cellular telephones, sometimes referred to as a control channel.

24.     In many cases, the control channel is shared by multiple cellular devices.   When multiple cellular devices share a control channel, each device must be able to receive and interpret messages that are addressed to it.  The '151 Patent explains how that was done for the downlink control channel in the version of the standard (Release 5) that predates the one accused of infringement in this investigation.   In that previous version, called "HSDPA" the downlink control channel sent control messages out to multiple cellular devices, and distinguished among those devices by using a user specific identification.  '151 Patent at 1:24–28, 1:54–55 (describing the prior art "HSDPA" method of identifying a specific "WTRU" (UE) in an HS-SCCH transmission, as part of "Release 5 (R5)" WCDMA systems).   The user specific identification was used to mask a cyclic redundancy check (CRC) value.  *Id.*   This description of using a masked, device-specific CRC value is in the "Background" section of the specification of the '151 Patent, and was known in the prior art.  *Id.* at 1:24–2:12 (discussing alleged problems with prior art cellular systems, including the prior art HS-SCCH system employing the WTRU-specific CRC value.).

25.     It is possible to employ a first control channel for sending a message to a cellular device indicating when it is allowed to download data, also known as "downlink," and a second control channel to instruct a cellular device when it may upload data, also known as "uplink."

12

26.     In late 2002 and early 2003, the working group discussed using a single control channel for sending messages to cellular devices about the assignment of both uplink and downlink bandwidth. The single control channel under discussion during that time period would also be shared by multiple cellular devices. It was therefore suggested that, when the network sent out messages on the control channel, each cellular device would successfully interpret only those messages that are addressed to it.

27.     In particular, in October, 2002, at a TSG-RAN Working Group 1 meeting attended by Marian Rudolf and Stephen Dick, Motorola submitted a proposal for how to use a single control channel to transmit control messages for both the uplink and downlink directions. *See* Exhibit J (hereinafter the "Motorola Proposal"). The Motorola Proposal is titled "Uplink enhancements for dedicated transport channels."

28.     The Motorola Proposal suggests using the control channel previously used for downlink transmissions—a control channel called the "HS-SCCH"—to send messages related both to downlink transmissions (on the downlink channel called the "HS-DSCH") and to uplink transmissions (on an uplink channel called "EUDTC"). The relevant passage is as follows:

> "6.     Control channel design to support EUDTC:
>
> One of the options for control channel design of EUDTC is to <u>use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC</u>. This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH. The second option is to define a new set of control channels to support EUDTC operation. Finally, the third option is to use 10 msec frame size. Further, the design of control channels when the UE is in soft-handoff should be addressed." Motorola Proposal at 2 (emphasis added).

29.     As can be seen from the underlined portion, the Motorola Proposal suggests "piggyback[ing]" the uplink control information onto the existing downlink control channel, thus

sharing the same control channel for messages pertaining to transmission in the uplink and downlink directions.

30.     The Motorola Proposal also defines how to do so: by having a frame format for transmissions pertaining to the uplink direction that is different from the format used for transmissions pertaining to the downlink direction: "This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."

31.     Finally, the Motorola Proposal make clear that it will "use the control channels for Rel-5 HS-DSCH" (i.e., the prior art "Release 5" version of the HSDPA standard) to distinguish between particular UEs receiving signals on the shard control channel. As discussed above in the context of the admitted prior art in the Background section of the '151 Patent, the control channel used to govern transmission on the "HS-DSCH" in Release 5 of HSPDA—the HS-SCCH—used a UE-specific CRC value.

32.     In sum, the Motorola Proposal teaches using a single control channel for transmitting both uplink and downlink messages, distinguishing between uplink and downlink messages using different message "formats," and identifying a specific recipient for the message by using a device-specific CRC value as specified in the previous "Release 5" version of the standard.

33.     Marian Rudolf and Stephen Dick attended the Working Group 1 meeting at which the Motorola Proposal was presented and received copies of the Motorola Proposal. Marian Rudolf and Stephen Dick were aware as of October 2002 that the scheme of using a single control channel for both the uplink and the downlink, and distinguishing between uplink control transmissions and downlink control transmissions through the use of different message formats, was already invented by others. *See* Exhibit A.

14

34.     In January 2003, at a TSG-RAN Working Group 1 meeting attended by Marian

Rudolf, Siemens submitted a proposal for how to use a single "control channel" to transmit

messages to multiple cellular devices and grant individual cellular devices permission to transmit

in the uplink and downlink directions. *See* Exhibit K (hereinafter the "Siemens Proposal").

35.     The Siemens Proposal discloses using a single control channel to send both uplink

and downlink control information.   In particular, the Siemens Proposal suggests re-using the

preexisting downlink control channel (the "HS-SCCH") to send messages pertaining both to the

downlink channel (the "HS-DSCH") and to the uplink channel (the "EU-DCH"):

> 2.     Re-use of HS-SCCH
>
> Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel). Consequently, EU-SCCH uses also a 3-slot format and is time-aligned at Node B with HS-SCCH transmissions. This particular format for EU-DCH associated downlink control information allows the same shared control channel to be used for EU-DCH and HSDPA users in time multiplex.

Siemens Proposal at 1 (emphasis added).

36.     Moreover, the Siemens Proposal points out that transmissions pertaining to the

downlink direction can be distinguished from transmissions pertaining to the uplink direction by

making use of pre-existing data structures used to store the "channelisation code-set field" which

previously contained 7 bits of data representing the channelization code set. *Id.* By using a

value for the channelization code set that was "unused" in the previous version of the standard,

the Siemens Proposal allows  the network to specify to a cellular device (referred to in the

Siemens Proposal as "user equipment," or "UE") that the transmission relates to the uplink (EU-

DCH) direction:  "As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within

15

the channelisation code-set field (denoted as "redundant area" in Fig. 1, [1]), which could be used for EU-DCH downlink signalling." *Id.* Figure 1 is a table showing the unused codes, in the "Redundant area":



**Fig 1: Reuse of the redundant area of HS-SCCH part 1 for downlink signalling of EU-DCH**

37.     Finally, the Siemens Proposal suggests using the pre-existing HS-SCCH coding format to specify the particular user equipment ("UE") that is intended to receive the transmission.  "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. . . .  A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA and EU-DCH data transmission and receiver implementation is notably simplified."  Siemens Proposal at 1–2.  As discussed above, as admitted in the Background section of the '151 Patent, the existing coding structure for HS-SCCH used a UE-specific CRC value that is generated from Part 1 and Part 2 of the HS-SCCH.

38.     In sum, the Siemens Proposal teaches using a single control channel for both uplink and downlink messages, distinguishing between uplink and downlink messages using different message "formats," and identifying a specific recipient for the message by using the

16

preexisting coding structure of HS-SCCH, as specified in the previous HSDPA version of the standard.

39.     Marian Rudolf attended the Working Group 1 meeting at which the Siemens Proposal was presented and received copies of the Siemens Proposal.  Marian Rudolf was aware as of January 2003 that the scheme of using a single control channel for both the uplink and the downlink, by distinguishing between uplink control transmissions and downlink control transmissions through the use of the "unused" codewords in the previous version of the standard, was already invented by others.  *See* Exhibit C.

40.     InterDigital filed a provisional application with the PTO on November 18, 2003. *See* Exhibit L (hereinafter the "Provisional Application").  The Provisional Application is titled "Novel Resource Assignment Channel Configuration for Enhanced Uplink Operation."  *Id.* at 7.

41.     Like the Motorola Proposal and the Siemens Proposal, the Provisional Application describes a way to use a single shared control channel to send transmissions pertaining to both the downlink and uplink directions:  "The foregoing and other shortcomings of the prior art are resolved by providing a high speed shared control channel (HS-SCCH) and an uplink (UL) resource assignment channel· in a shared downlink (DL) radio resource space, and by distinguishing received high speed shared control channel (HS-SCCH) transmissions from uplink (UL) resource assignment channel transmissions."   Provisional Application ¶ 0018 (emphasis added here and in all cases below).

42.     One of the preferred embodiments of the Provisional Application is identical in all relevant respects to the shared control channel described in the Siemens Proposal, and several embodiments use the Motorola Proposal's approach to distinguishing between the uplink and downlink directions.

17

43.     Both the Motorola Proposal and the Provisional Application describe using a single control channel that employs conventional HS-SCCH transmissions for the downlink (i.e., the same transmissions used in the prior art Release 5 version of the standard) and UL Resource Assignment transmissions for the uplink.  Likewise, both the Siemens Proposal and the Provisional Application describe using a single control channel that employs conventional HS-SCCH transmissions for the downlink (i.e., the same transmissions used in the prior art version of the HSDPA standard) and UL Resource Assignment transmissions for the uplink (emphasis added in all cases).

| Provisional Application | Motorola Proposal | Siemens Proposal |
|---|---|---|
| "The foregoing and other shortcomings of the prior art are resolved by providing a high speed shared control channel (HS-SCCH) and an uplink (UL) resource assignment channel in a shared downlink (DL) radio resource space, and by distinguishing received high speed shared control channel (HS-SCCH) transmissions from uplink (UL) resource assignment channel transmissions." ¶ 0018. | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel)." Siemens Proposal at 1. |

44.     In several embodiments of the Provisional Application, and in the Motorola Proposal, the UE can, in the phrasing used by the Provisional Application, "distinguish" between transmissions related to the downlink and transmissions related to the uplink by looking at the format of the frame transmitted on the shared control channel.  In at least the first, second, and third disclosed embodiments of the Provisional Application, the direction for the control signal is specified by the frame format.

18

| Provisional Application | Motorola Proposal |
|---|---|
| "Pursuant to the techniques of the present invention, any of several methods may be employed <u>to distinguish HS-SCCH transmissions from DL Resource Assignment channel transmissions</u>. These methods include: (a) channel indication by means of selecting <u>one or more 'impossible' combinations in channelization code set mapping</u>, (b) inversion of UE-specific cyclic redundancy check (CRC), (c) utilizing different UE-specific masking sequences . . ." Provisional Application ¶ 0020; *see generally* ¶¶ 0033–0035 (describing "Method 1," "Method 2," and "Method 3" for distinguishing between the uplink and downlink channels). | "This can be achieved by defining an additional frame format for <u>HS-SCCH</u> and HS-DPCCH." Motorola Proposal at 2. |

45.    Likewise, in the first embodiment of the Provisional Application, and in the Siemens Proposal, the UE can distinguish between transmissions related to the downlink and transmissions related to the uplink by using special values in an unused field in the previous version of the HSDPA standard.   Both the Provisional Application and the Siemens Proposal explain how this distinguishing can take place:  by looking to see whether one of the fields of the transmission—the "channelisation code-set" field—is one of eight codewords that are "unused" or "impossible" in the prior art implementation:

| Provisional Application | Siemens Proposal |
|---|---|
| "Pursuant to the techniques of the present invention, any of several methods may be employed <u>to distinguish HS-SCCH transmissions from DL Resource Assignment channel transmissions</u>. These methods include: (a) channel indication by means of selecting <u>one or more 'impossible' combinations in channelization code set mapping</u> . . ." Provisional Application ¶ 0020; *see generally* ¶ 0033 (describing "Method 1" for distinguishing between the uplink and | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides <u>8 unused codewords</u> within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), <u>which could be used for EU-DCH downlink signalling</u>." Siemens Proposal at 1. |

| downlink channels, using "One or more 'Impossible' Combinations in the Channelization Code Set Mapping"). | |
|---|---|

46.     Indeed, the figure used to depict the "impossible combinations" in the Provisional Application is copied and pasted from the figure used in the Siemens Proposal to depict the "8 unused codewords":

| Provisional Application | Siemens Proposal |
|---|---|
|  FIG. 2 |  Fig. 1 |

47.     Finally, in both the Motorola Proposal and the Siemens proposal, the shared downlink channel relies on the same prior art method for confirming which UE a transmission is directed to that is used in the Provisional Application:  using the user-specific identification in the same manner it was used in the preexisting HS-SCCH structure.

| Provisional Application | Motorola Proposal | Siemens Proposal |
|---|---|---|
| "Confirmation that a demodulated transmission is intended for the UE is obtained using a UE-specific CRC." ¶ 0025. | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used." |

20

| | | |
|---|---|---|
| "The R5 HS-SCCH is sent . . . along with a UE-specific cyclic redundancy check (CRC) (see 3GPP TS25.212)." ¶ 0008 (discussing the HS-SCCH in the prior art HSDPA system). | can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2. | "A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA and EU-DCH data transmission and receiver implementation is notably simplified." Siemens Proposal at 1–2. |

48.     Moreover, both the Provisional Application and the Siemens Proposal argue that transmitting uplink control messages on the same channel already used for downlink control messages has performance and efficiency benefits—namely, the UE can have reduced complexity and better performance because it only needs to monitor a single control channel.

| Provisional Application | Siemens Proposal |
|---|---|
| "In a straightforward extension of existing R5 mechanisms, UL Resource Assignment Channel's for FDD Enhanced UL could be introduced 'on top' of existing HS-SCCH's for HSDPA. In other words, a separate set of SF=128 DL channels are configured to contain one or more UL Resource Assignment Channels. With this approach, in a typical HSDPA operation scenario, a UE would then be required to monitor one or several UL Resource Assignment Channels in addition to the up to 4 HS-SCCHs it must already monitor." ¶ 0014.<br><br>"Relative to the prior art approaches described hereinbefore, a high speed shared control channel (HS-SCCH) and an uplink (UL) resource assignment channel that occupy a shared downlink (DL) radio resource space reduces UE complexity increases UE battery efficiency, and permits enhanced DL spreading code usage." ¶ 0019. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. . . .  Additionally it decreases UE complexity, since less control channels need to be monitored in cases where HS-DSCH and EU-DCH are used concurrently."  Siemens Proposal at 1. |

49.    Thus the Provisional Application, like the Motorola Proposal and the Siemens Proposal, describes using a single control channel for both uplink and downlink messages, distinguishing between uplink and downlink messages using different message formats (including, as in the Siemens Proposal, different values for the "channelization code set" field), and identifying a specific recipient for the message by using the pre-existing HS-SCCH coding structure, which included a device-specific CRC value.   And the Provisional Application and the Siemens Proposal cite precisely the same benefits from doing so.

50.    The Provisional Application also includes claims.   Claim 1 purports to cover the process already disclosed in the Motorola Proposal and the Siemens Proposal:

> 1.    A method for communicating with a user equipment (UE) over a wireless link comprised of a downlink (DL) and an uplink (UL), the method comprising the steps of:
>
> (a) sharing at least a portion of the DL so as to provide a high speed shared control channel (HS-SCCH) and an UL resource assignment channel, and
>
> (b) distinguishing received high speed shared control channel (HS-SCCH) transmissions from uplink (UL) resource assignment channel transmissions.

51.    This claim recites the same basic three elements already discussed:   a control channel for both "HS-SCCH" and "uplink (UL)" control messages; "distinguishing" transmissions related to the HS-SCCH from transmissions related to the uplink; and "sharing" the channel among multiple UEs.   This claimed process is identical to what is disclosed in the Motorola Proposal and the Siemens Proposal.

52.    InterDigital filed the nonprovisional application, which ultimately issued as the '151 Patent, on July 29, 2004.   *See* Exhibit M.   Both the Motorola Proposal and the Siemens

22

Proposal describe preferred embodiments of the '151 Patent. And like the Provisional Application, the '151 Patent includes material taken directly from the Siemens Proposal.

53.    In particular, both the '151 Patent and the Motorola Proposal describe using a single control channel that employs conventional HS-SCCH transmissions for the downlink (i.e., the same transmissions used in the prior art Release 5 version of the standard) and UL Resource Assignment transmissions for the uplink. Likewise, both the '151 Patent and the Siemens Proposal describe using a single control channel that employs conventional HS-SCCH transmissions for the downlink (i.e., the same transmissions used in the prior art version of the HSDPA standard) and UL Resource Assignment transmissions for the uplink.

| 151 Patent | Motorola Proposal | Siemens Proposal |
|---|---|---|
| "The WTRU communicates with the Node-B via a common control channel, the UL channel and the DL channel. The WTRU receives a message from the Node-B via the common control channel. The message includes an indication of whether the message is intended for assigning radio resources to the UL charmel or the DL channel." 2:20–25.  "The Node-B 104 is configured to support an HSDPA and EU operation. Therefore, each Node-B 104 dynamically allocates radio resources for DL and UL transmissions to and from the WTRU 106 through an HS-DSCH and an EU channel, respectively. The radio resources assignment | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to <u>piggyback</u> the control information required for EUDTC. This can be achieved by defining an additional frame format for <u>HS-SCCH</u> and HS-DPCCH." Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. <u>This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel).</u>" Siemens Proposal at 1. |

23

| | | |
|---|---|---|
| information for both the HS-DSCH and the EU is transmitted through the common control channel 112." 3:33–39.<br><br>"High speed downlink packet access (HSDPA) has been developed to increase downlink (DL) efficiency and throughput in universal mobile telecommunication system (UMTS) Release 5 (R5) wideband code division multiple access (W-CD MA) systems. . . . The signaling channel, a high speed shared control channel (HS-SCCH), conveys radio resource allocation information to a plurality of wireless transmit/receive units (WTRUs)." 1:33–36. | | |

54.     In several embodiments of the '151 Patent, as in the Motorola Proposal, the UE can distinguish between transmissions related to the downlink and transmissions related to the uplink by looking at the format of the frame transmitted on the shared control channel.  In at least the first, second, and third disclosed embodiments of the '151 Patent, the direction for the control signal is specified by the frame format.

| 151 Patent | Motorola Proposal |
|---|---|
| "In accordance with a first embodiment of the present invention, an indication that a particular radio resource is assigned for a UL transmission is provided by means of one or more of the impossible combinations in the channelization code set mapping in a current HSDPA."  3:51–55. | "This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. |

24

| | |
|---|---|
| "In accordance with the second embodiment of the present invention, this WTRU-specific CRC is modified in a unique and deterministic way to indicate that the demodulated transmission is for UL transmission, rather than DL transmission." 4:13–16.<br><br>"In accordance with a third embodiment of the present invention, an indication that a particular radio resource is assigned for an EU is provided by means of a WTRU - specific masking sequence." 4:28–31. | |

55. Also, as in the Siemens Proposal, the '151 Patent describes distinguishing between transmissions related to the downlink and transmissions related to the uplink, using the channelization code-set field.

| 151 Patent | Siemens Proposal |
|---|---|
| "In accordance with a first embodiment of the present invention, an indication that a particular radio resource is assigned for a UL transmission is provided by means of one or more of the impossible combinations in the channelization code set mapping in a current HSDPA. FIG. 2 is a look-up table for channelization code set mapping currently used in the HSDPA." 3:51–57. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), which could be used for EU-DCH downlink signalling." Siemens Proposal at 1. |

56. Figure 2 from the '151 Patent is carried over from Figure 2 of the Provisional Application, which in turn is taken from Figure 1 of the Siemens Proposal.

25

| 151 Patent | Siemens Proposal |
|---|---|



57.     Finally, in both the Motorola Proposal and the Siemens proposal, the shared downlink control channel relies on the same prior art method for determining which UE a transmission is directed to that is used in the '151 Patent: preexisting structure of the HS-SCCH and specifically the use of user specific identification (UE-ID), which was used in the preexisting structure to mask the CRC.

| 151 Patent | Motorola Proposal | Siemens Proposal |
|---|---|---|
| "In accordance with a second embodiment of the present invention, an indication that a particular radio resource is assigned for UL transmission is provided by means of a WTRU-specific CRC. Under current HSDPA specifications, a WTRU-specific CRC is contained in an HS-SCCH field 2. A 16-bit CRC is computed from the information to be transmitted, and the computed CRC is masked with a unique 16-bit WTRU identity (ID). The | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used."<br><br>"A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA and EU-DCH data transmission and receiver implementation is notably simplified." |

26

| | | |
|---|---|---|
| masked CRC is transmitted to a WTRU 106 as a WTRU-specific CRC." 4:4–12. | | Siemens Proposal at 1–2. |

58.     As with the Provisional Application, the '151 Patent argues that transmitting uplink control messages on the same channel already used for downlink control messages has the performance and efficiency benefits discussed in the Siemens Proposal—namely, the UE can have reduced complexity and better performance because it only needs to monitor a single control channel.

| 151 Patent | Siemens Proposal |
|---|---|
| "Thus, it is possible to introduce a separate set of SF=128 DL channels as UL resource assignment channels. With this approach, a WTRU would be required to monitor one or more UL resource assignment channels in addition to the HS-SCCHs for an HSDPA operation. Although this approach is conceptually simple, there are many disadvantages with this scheme, such as WTRU complexity, WTRU battery efficiency, and DL spreading code usage." 2:3–9 (describing disadvantages of using two separate control channels, which are alleged to be overcome by the claimed invention). | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. . . .  Additionally it decreases UE complexity, since less control channels need to be monitored in cases where HS-DSCH and EU-DCH are used concurrently."  Siemens Proposal at 1. |

59.     Moreover, at least asserted independent claims 1 and 16 purport to cover the process already disclosed in the Motorola Proposal and in the Siemens Proposal.

60.     The Motorola Proposal and the Siemens Proposal disclose a control channel for both downlink and uplink channel assignment information:

27

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 1. A method for utilizing channel assignment information for an uplink shared channel or a downlink shared channel, the method comprising: a wireless transmit/receive unit (WTRU) receiving downlink control information including downlink or uplink channel assignment information via a same physical downlink control channel, both downlink channel assignment information and uplink channel assignment information being received via the same physical downlink control channel; | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel)." Siemens Proposal at 1. |

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 16. A wireless transmit/receive unit (WTRU) for utilizing channel assignment information for an uplink shared channel or a downlink shared channel, the WTRU comprising: a receiver configured to receive downlink control information including downlink or uplink channel assignment information via a same physical downlink control channel, both downlink channel assignment information and uplink channel assignment information being received via the same physical downlink control channel; | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel)." Siemens Proposal at 1. |

61.     The Motorola Proposal and the Siemens Proposal disclose "determining" whether the downlink control information is intended for the UE.

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 1. …the WTRU determining whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2; *see* '151 Patent at 1:24–2:12 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. . . .  A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA and EU-DCH data transmission and receiver implementation is notably simplified."  Siemens Proposal at 1–2; *see* '151 Patent at 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 16. … a controller configured to determine whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2; *see* '151 Patent at 1:24–2:12 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. . . .  A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA and EU-DCH data transmission and receiver implementation is notably simplified."  Siemens Proposal |

29

| | | |
|---|---|---|
| | distinguish transmissions to that WTRU). | at 1–2; *see* at 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |

62.     As discussed above, it was known in the admitted prior art (described in the '151 Patent) that the existing "HSDPA" specifications use a WTRU-specific CRC in the "HS-SCCH" channel to identify transmissions intended for a particular WTRU.

| Claims | Meaning of "HSDPA" to a Person of Ordinary Skill in the Art |
|---|---|
| 1. …the WTRU determining whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "Under current HSDPA specifications a WTRU-specific CRC is contained in an HS-SCCH field 2." '151 Patent 4:7–8; *id.* 1:49–55 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU); *id.* 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |

| Claims | Meaning of "HSDPA" to a Person of Ordinary Skill in the Art |
|---|---|
| 16. … a controller configured to determine whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "Under current HSDPA specifications a WTRU-specific CRC is contained in an HS-SCCH field 2." '151 Patent 4:7–8; *id.* 1:49–55 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU); *id.* 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |

63.     The Motorola Proposal and the Siemens Proposal disclose "determining" whether the channel assignment information is for uplink or downlink and utilizing that information:

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 1. … if so determining whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel; and the WTRU utilizing the radio resources for the uplink shared channel or the downlink shared channel. | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), which could be used for EU-DCH downlink signalling."  Siemens Proposal at 1. |

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 16. … determine whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel, and utilizing the radio resources for the uplink shared channel or the downlink shared channel. | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH." Motorola Proposal at 2. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), which could be used for EU-DCH downlink signalling."  Siemens Proposal at 1. |

64.     On information and belief, but for the applicants' deliberate decision to withhold the Motorola Proposal and the Siemens Proposal from the '151 Patent examiner, the PTO would not have allowed at least asserted claims 1 and 16 of the '151 Patent.  The Motorola Proposal and the Siemens Proposal, by themselves or in combination with the admitted prior art, disclose each and every element of these claims—indeed, the Siemens Proposal teaches the specific

31

method of distinguishing between uplink and downlink used in an embodiment of the '151 Patent, and describes that method using precisely the same figure.

65.     On information and belief, the decision to withhold the Motorola Proposal and the Siemens Proposal was deliberate, and made with fraudulent intent.  At least inventors Marian Rudolf and Stephen Dick were specifically aware of the Motorola Proposal, as they attended the Working Group 1 meeting at which the Motorola Proposal was presented.  At least inventor Marian Rudolf was specifically aware of the Siemens Proposal, as he attended the Working Group 1 meetings at which the Siemens Proposal was presented.  In addition, 3GPP working group documents for any given meeting are distributed prior to the meeting to the appropriate working group or to those persons registered as regular participants—including other named inventors on the '151 Patent.  Given that multiple inventors were actively involved with TSG-RAN Working Group 1 and regularly attended Working Group 1 meetings, they were clearly aware of the Siemens Proposal and the Motorola Proposal.

66.     The inventors' awareness of the Motorola Proposal is also evident from the inclusion of a related Motorola submission in the cited prior art for the '151 Patent.  In particular, the cited prior art for the '151 Patent includes a publication titled "3GPP TSG RANWG 1 Tdoc R1-02-1350, Motorola, 'Design Considerations for Enhanced Uplink Dedicated Channel,' Shanghai, China, Nov. 2002." '151 Patent at p. 2.  The 1350 proposal cites the Motorola Proposal discussed above. *See* Exhibit N at 1, 5.

67.     The inventors' awareness of the Siemens Proposal is also evident from the Provisional Application and the specification of the '151 Patent themselves, which (as already discussed) take the idea of using the "unused" values of the channelization code-set field and the figure used to illustrate that idea directly from the Siemens Proposal.

32

68.   On information and belief, knowing that disclosing the Motorola Proposal and /or the Siemens Proposal would prohibit obtaining a patent, at least inventor Rudolf and inventor Dick made the conscious choice not to disclose the prior art to the PTO.  The inventors disclosed several working group documents to the Examiner from other meetings attended by the inventors and occurring around the same time as the Motorola Proposal and the Siemens Proposal—including the related 1350 proposal—but at least Marian Rudolf and Stephen Dick chose not to disclose the Motorola Proposal and the Siemens Proposal to the PTO.

69.   For example, both Marian Ruldolf and Stephen Dick attended the Working Group 1 meeting in Shanghai, China, held November 2002, and disclosed the following working documents associated with this meeting to the PTO: (1) Tdoc R1-02-1277, Nokia, "Two Threshold Node B Packet Scheduling," Shanghai, China, Nov. 2002; (2) Tdoc R1-02-1350, Motorola, "Design Considerations for Enhanced Uplink Dedicated Channel," Shanghai, China, Nov. 2002; and (3) Tdoc R1-02-1277, Nokia, "Two Threshold Node B Packet Scheduling," Shanghai, China, Nov. 2002.  *See* Exhibit B.  However, Marian Rudolf and Stephen Dick attended the Working Group 1 meeting preceding the Shanghai meeting, held October 2002 in Espoo Finland, and chose not to disclose the highly relevant Motorola Proposal.  And Marian Rudolf attended the Working Group 1 meeting following the Shanghai meeting, held January 2003 in San Diego, California, and chose not to disclose the highly relevant Siemens Proposal.  *See* Exhibit C.

70.   The deliberate choice by at least Marian Rudolf to use material taken from the Siemens Proposal in the first described embodiment of the '151 Patent, and the choice to disclose to the USPTO other Working Group materials while withholding the Siemens Proposal, demonstrate fraudulent intent.  The deliberate choice of at least Marian Rudolf and Stephen Dick

33

to disclose certain Working Group submissions, including the Motorola 1350 proposal, while withholding the directly relevant Motorola Proposal, demonstrates fraudulent intent.  The pattern of withholding multiple prior art references that disclose the use of a single control channel and the other requirements of at least claims 1 and 16 of the '151 Patent further demonstrates fraudulent intent.  On information and belief, the inventors, including at least Marian Rudolf and Stephen Dick, withheld the Motorola Proposal and the Siemens Proposal with the intent of hiding from the PTO that the alleged inventions of at least claims 1 and 16 of the '151 Patent were not invented by the named inventors, but rather were taken from the prior work of others.  As discussed above, but for the inventors' failure to disclose the Motorola Proposal and the Siemens Proposal, at least claims 1 and 16 of the '151 Patent would not have issued.

71.    ZTE (USA) is continuing to obtain and review information related to the large family of U.S. and foreign patents and publications related to the asserted patent, and accordingly, ZTE (USA) intends to set forth further allegations regarding the inequitable conduct associated with the procurement of the asserted patent as discovery continues.

## COUNTERCLAIMS

Pursuant to Federal Rule of Civil Procedure 13, ZTE (USA) pleads the following counterclaims against Plaintiff/Counterclaim Defendants InterDigital Communications, Inc., InterDigital Technology Corporation, IPR Licensing, Inc., and InterDigital Holdings, Inc. (collectively "InterDigital").

## NATURE OF THE ACTION

1.    ZTE (USA) brings this action to enforce contractual commitments made by InterDigital to license on Fair, Reasonable and Non-Discriminatory ("FRAND") terms patents

34

that InterDigital claims are essential to various 3G and/or 4G wireless standards.  In breach of those commitments, InterDigital has failed to offer FRAND licenses to ZTE (USA).

2.     In further breach, InterDigital filed a complaint on July 26, 2011 which initiated an investigation before the United States International Trade Commission, Inv. No. 337-TA-800 (the "800 ITC Proceeding").  InterDigital filed another complaint on January 2, 2013, initiating a new investigation before the ITC, docket no. 337-2929, which has not been assigned an investigation number yet (the "New ITC Proceeding").  Through these proceedings (collectively, the "ITC Proceedings"), InterDigital seeks to harm irreparably ZTE (USA)'s substantial business by enjoining importation of its products, and seeks to extract unfair and unreasonable license terms.  Yet, by virtue of its FRAND commitments, InterDigital effectively agreed to forego injunctions or exclusionary relief against parties willing to agree to FRAND license terms with respect to valid and essential patents they use, as ZTE (USA) is willing to do.

3.     ZTE (USA) seeks enforcement of InterDigital's contractual commitment to license its standards-essential patents on FRAND terms, and a determination of an appropriate FRAND royalty for InterDigital's U.S. 3G and/or 4G patent portfolios.

## THE PARTIES

4.     ZTE (USA) is a Texas corporation with its principal place of business in Texas. ZTE (USA) imports and sells a range of electronic devices including mobile communication and media devices.

5.     Counterclaim Defendant InterDigital Communications, Inc. is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

6.     Counterclaim Defendants InterDigital Technology Corporation is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

7.     Counterclaim Defendant IPR Licensing, Inc. is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

8.     Counterclaim Defendant InterDigital Holdings, Inc. is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

## GENERAL ALLEGATIONS

9.     In the 800 ITC Proceeding, InterDigital alleges that various claims of seven patents are being infringed by ZTE (USA), namely U. S. Patent Nos. 7,502,406, 7,536,013, 7,616,970, 7,706,830, 7,970,127 , and 8,009,636 (collectively the "800 Asserted Patents").

10.     In the New ITC Proceeding, InterDigital alleges that various claims of three patents are being infringed by ZTE (USA), namely U.S. Patent Nos. 7,190,996, 7,286,847, and 7,941,151 (collectively with the 800 Asserted Patents, the "Asserted Patents").

11.     Through the ITC Proceedings, InterDigital seeks exclusion and cease and desist orders barring ZTE (USA) and other respondents from, among other things, importing and selling Accused Products in the United States with 3G or 4G capabilities.  By the earlier filed action, this action, and its new ITC Complaint, InterDigital seeks injunctive and/or exclusionary relief barring ZTE (USA) from using, making, importing, offering for sale and/or selling various accused products in the United States with 3G and 4G capabilities.

12.     Prior to the institution of the ITC Proceedings, InterDigital participated in developing standards with various Standard Setting Organizations ("SSOs"), including the

36

European Telecommunications Standards Institute ("ETSI") and the 3rd Generation Partnership

Project ("3GPP") and the International Telecommunications Union ("ITU").

13.    As relevant here, InterDigital declared each of the 800 Asserted Patents to be

"essential" Intellectual Property Rights ("IPR") to 2G, 3G and/or 4G standards committed to

providing licenses on FRAND terms.    Additionally, in the current Amended Complaint,

InterDigital alleges infringement by virtue of ZTE (USA)'s accused products' compliance with

technological standards. *E.g.*, Amended Complaint at ¶ 25 ("[T]he accused ZTE products . . . are

designed to comply with the Release 99, Release 4, HSDPA, HSUPA, and/or HSPA+ standards.

Because the accused products are specifically designed to so operate, they have no substantial

noninfringing uses.").   On information and belief, each of the New Asserted Patents have been

declared or disclosed to SSOs as essential or potentially essential to a 2G, 3G and/or 4G

technological standard.

14.    The SSOs and their members, for the benefit of their members and non-members,

including ZTE (USA), relied on InterDigital's FRAND commitments when they adopted these

technologies, including proposals from InterDigital, into 2G, 3G and/or 4G standards.   SSOs

require FRAND commitments to ensure that patent owners will not attempt to block manufacture

and sale of products practicing the standards, and to ensure that patent owners will not seek to

impose onerous royalties or licensing terms and conditions on such products, given that the

adoption of the standard eliminates alternative technologies competing to become incorporated

into the standard.

15.    Market participants like ZTE (USA) have made substantial investments to

develop and market products designed to be compatible with these standards in reliance upon

InterDigital's explicit and implicit commitments to license its purportedly essential IPR, including the Asserted Patents, on FRAND terms.

16.     Further, InterDigital seeks by the injunctions sought in the earlier filed action and in this action, and by the exclusion order sought in the ITC Proceedings, to exclude from the United States ZTE (USA)'s products by virtue of their compliance with standards to which InterDigital has committed but failed to license on FRAND terms and conditions.

17.     In further breach of its commitments, InterDigital has failed to offer and grant a license for each of the Asserted Patents to ZTE (USA) with FRAND terms and conditions, despite requests.  In particular, the terms and conditions offered to ZTE (USA) are significantly less favorable than the terms and conditions of licenses that InterDigital has entered into with prior licensees, including licensees that are competitors of ZTE (USA).

18.     At all relevant times, ZTE (USA) has been and is willing to license each of the Combined Asserted Patents on FRAND terms and conditions.  ZTE (USA) affirmatively has sought to establish a FRAND royalty rate for the Combined Asserted Patents for sales in the US so the royalty could be paid.  *See* Mar. 2, 2012 Hrg. Tr., Case No. 11-654 (D. Del.), 41:8-11, 23-25 ("The FRAND rate would be the final piece of the puzzle that would put- it would finalize the license.  InterDigital had an obligation to license.  ZTE (USA) stands here willing and will accept the license. . . . We're here to have you decide that issue, and ZTE (USA) is willing to be bound by your decisions on the FRAND rate.").

19.     ZTE (USA) brings these counterclaims to remedy InterDigital's violation of its FRAND commitments, for specific performance of these commitments, and for related declaratory relief

**The Importance of SSO-Related FRAND Commitments to the Wireless Industry**

20.     Mobile wireless carriers, handset manufacturers, and chipset manufacturers, among others, participate in SSOs to develop standards facilitating interoperability among cellular networks and various mobile devices.   Once standards are adopted, competing manufacturers, carriers, and sellers can offer compliant products and service.

21.     Standards play an important role in the development of wireless data and telecommunications technologies by facilitating product development and network creation. Market participants are generally willing to invest in the industry because, so long as their products are compliant with published standards, those products will operate effectively within the networks and be compatible with other third-party products.

22.     Agreed standards reduce costs for component suppliers, product manufacturers and consumers.   For suppliers, standardization can reduce the need to develop products to a particular manufacturer's specifications.    Because components may be sold to multiple manufacturers, manufacturing volumes can increase and per unit costs decrease.    Product manufacturers also benefit from increased price competition among suppliers.    When components are made to comply with a standard, switching suppliers typically does not require a substantial redesign of the manufacturer's products. Lower switching costs increase competition among suppliers, leading to lower consumer prices.

23.     The standard-setting process moves the industry towards a common standard by eliminating alternatives in favor of mandatory implementations of essential features of the standard.   The process can confer significant market power to an entity claiming ownership of a technology included in a standard.   That is particularly true in the telecommunications markets.

24.    Before standardization, the royalty a patentee could earn from a patent license for its technology was constrained by the availability of alternative technologies to perform similar functions.   However, once a standard requires employment of a patented technology as a mandatory implementation of an essential feature, alternative technologies are no longer economically practical.   Left unconstrained, owners of essential covering functions within the standard could demand exorbitant royalties from participants who effectively must use the IPR.

25.    To address this problem, most SSOs-including those relevant to this action have adopted policies.   These policies generally contain requirements concerning:  (a) the disclosure of that may claim any portion of the specifications of the standard and (b) whether and to what extent patentees declaring purported essential must commit to licensing that on FRAND terms.

26.    As set forth in greater detail below, the policies at issue in this case require participants declaring essential to commit to license that on FRAND terms.   Market participants rely on these commitments to ensure, among other things, that they will not be held up by patentees seeking unreasonable royalties after the industry is locked into the standard.

**SSO FRAND Licensing Policies Are Designed to Prevent Anticompetitive Activities**

27.    InterDigital is, and was at the relevant times, a member of and has participated in development of standards by multiple SSOs, including ETSI, 3GPP, and ITU.

28.    ETSI is an SSO governed by French law and is responsible for the standardization of information and communication technologies for the benefit of its members and third parties. 3GPP is a collaborative activity through a group of recognized SSOs (its "Organizational Partners"), including ETSI.   3GPP develops technical specifications subsequently presented to and adopted as standards by its Organizational Partners, such as ETSI.   ITU is the United Nations specialized agency for information and communication technologies.

40

29.     Like other SSOs, ETSI, 3GPP, and ITU have developed Policies designed to mitigate the risk of the anticompetitive hold-up by owners inherent in any standard-setting process. the absence of FRAND licensing obligations, an owner may demand unreasonable license fees or even refuse to license altogether and seek injunctive relief against any party that uses the patented technology.  SSO IPR Policies impose FRAND licensing obligations to ensure that IPR owners will not use their IPR to extract unreasonable license fees or to exclude any market participant that is willing to pay a FRAND license fee for use of the IPR.

30.     SSO Policies strike a delicate compromise between protecting and ensuring that essential, standardized technology will remain available to market participants and, ultimately, consumers.   Violation of owners' FRAND licensing obligations will negatively impact the market for wireless devices and the consumers who purchase them, with consequences ranging from increased prices to fragmentation of wireless communication standards.   Widespread violation of FRAND licensing obligations would threaten to unravel the entire SSO model for technology standardization.

31.     The FRAND licensing model is designed to eliminate these problems, providing device manufacturers and consumers with access to IPR for standardized technology, while ensuring that IPR owners receive fair and reasonable compensation for the use of their IPR. However, the system only works if IPR owners satisfy their obligation to make licenses available on FRAND terms.

**ETSI's IPR Policy**

32.     ETSI's IPR Policy is set forth in Annex 6 of its Rules of Procedure.  Clause 4.1 of the ETSI IPR Policy governs disclosure of essential IPR, requiring ETSI members to declare all essential IPR in a timely manner:

41

[E]ach MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.   In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

33.     Clause 15 of ETSI's IPR Policy defines IPR to mean "any intellectual property right conferred by statute law including applications therefor other than trademarks." Therefore, market participants have a reasonable expectation that all potentially essential patents or patent applications will be disclosed to ETSI.

34.     Clause 6 of ETSI's IPR Policy governs the availability of licenses to essential IPR, requiring ETSI members to offer licenses to essential IPR on FRAND terms.   In relevant part, Clause 6.1 states:

When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent: MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE; sell, lease or otherwise dispose of EQUIPMENT so MANUFACTURED; repair, use, or operate EQUIPMENT; and use METHODS.

35.     Clause 8 of ETSI's IPR Policy governs situations where an owner of essential IPR refuses to undertake a FRAND commitment.   In relevant part, Clause 8.1 states:

8.1.1    Where prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION which:

- is not blocked by that IPR; and

- satisfies ETSI' s requirements.

42

8.1.2. Where, in the opinion of the General Assembly, no such viable alternative technology exists, work on the STANDARD or TECHNICAL SPECIFICATION shall cease, and the Director-General of ETSI shall observe the following procedure:

a)      If the IPR owner is a MEMBER,

      i)      the Director-General of ETSI shall request that MEMBER to reconsider its position.

      ii      If that MEMBER however decides not to withdraw its refusal to license the IPR, it shall then inform the Director-General of ETSI of its decision and provide a written explanation of its reasons for refusing to license that IPR, within three months of its receipt of the Director General's request

      iii)      The Director-General of ETSI shall then send the MEMBER's explanation together with relevant extracts from the minutes of the General Assembly to the ETSI Counsellors for their consideration.

36.      Thus, if an ETSI member refuses to agree to FRAND licensing of essential IPR, ETSI will select an alternative technology to incorporate into the standard, or will stop work entirely on the standard if no alternative is available.

37.      ETSI's IPR Policy was designed to benefit all ETSI members, as well as nonparties complying with ETSI standards.  The explicit objective of the policy, described in Clause 3.1, is to "reduce the risk" to those complying with the standards and technical specifications "that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

### 3GPP's IPR Policy

38.      As a collaborative activity among its Organizational Partners (including ETSI), 3GPP requires its members to declare and offer licenses to essential IPR on FRAND terms, as well as to abide by the IPR policies of their respective Organizational Partner. Article 55 of the 3GPP Working Procedures states, in relevant part:

43

Individual Members shall be bound by the IPR Policy of their respective Organizational Partner.

Individual Members should declare at the earliest opportunity, any IPRs which they believe to be essential, or potentially essential, to any work ongoing within 3GPP. Declarations should be made by Individual Members to their respective Organizational Partners.

Organizational Partners should encourage their respective members to grant licenses on fair, reasonable terms and conditions and on a non-discriminatory basis.

39.     As a 3GPP "Individual Member," InterDigital was "bound by the IPR Policy" of ETSI, the "Organization Partner" through which InterDigital participated in 3GPP. That policy requires InterDigital to offer a FRAND license as described in paragraphs 27-31 of these counterclaims.

## ITU's IPR Policy

40.     Under ITU's Common Patent Policy, if a technical recommendation is developed and essential **IPR** has been disclosed, then either the patent holder must declare that it is willing to negotiate licenses "free of charge" or "on a non-discriminatory basis on reasonable terms and conditions." If the patent holder is not willing to declare under either of those provisions, and indicates an unwillingness to license under those constraints, then "the Recommendation | Deliverable shall not include provisions depending on the patent."

## InterDigital Has Binding FRAND Obligations with Respect to the Asserted Patents

41.     During all relevant times, InterDigital was a member of ETSI, 3GPP, and ITU. InterDigital participated in ETSI's, 3GPP's, and ITU's development of mobile communications standards for, among others, Global System for Mobile Communications ("GSM"), Universal Mobile Telecommunications System ("UMTS"), and 3GPP.

44

42.     InterDigital explicitly has declared to ETSI and/or ITU that each of the Asserted Patents is essential to one or more 2G, 3G and/or 4G standards, and explicitly has undertaken to grant irrevocable licenses to each of the Asserted Patents on FRAND terms and conditions.

43.     As a result of its membership and participation in the SSOs, and its declarations and concomitant commitments, InterDigital was and is bound by their policies and procedures, including IPR Policies, and is obligated to license the Asserted Patents on FRAND terms. InterDigital, however, has engaged in a course of conduct that has violated the very policies put in place by these SSOs to prevent the anticompetitive patent hold-up by which InterDigital now seeks to profit.

**InterDigital Has Breached Its FRAND Obligations**

44.     Notwithstanding InterDigital's declarations of essentiality, and implicit and explicit FRAND commitments, InterDigital has failed to offer a FRAND license to ZTE (USA) with respect to potentially essential patents in its portfolio- including the Asserted Patents at issue in the ITC Proceedings.

45.     Additionally, InterDigital initiated the ITC Proceedings, by which InterDigital seeks to harm irreparably ZTE (USA)'s substantial business by seeking to exclude its products and to extract unfair and unreasonable license terms.

**COUNT I**
**BREACH OF CONTRACT**

46.     ZTE (USA) incorporates the allegations set forth in paragraphs 1-45 above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

47.     The conduct of InterDigital as alleged above constitutes breach of contract.

48.     As set forth above, InterDigital entered into express or implied contracts with ETSI, 3GPP, ITU, their members, and manufactures and sellers of products designed to be

compliant with standards adopted by these SSOs, including ZTE (USA), to grant licenses to its purportedly essential IPR on FRAND terms.

49.     InterDigital has breached and continues to breach these contracts by failing to license purportedly essential IPR, including the Asserted Patents, on FRAND terms.

50.     As a result of these multiple contractual breaches, ZTE (USA) has been injured, including in its business and property.   ZTE (USA) has been forced to expend resources resolving this licensing dispute, and is threatened, in particular, with irreparable loss of profits, loss of customers and potential customers, loss of goodwill and product image, and uncertainty among customers and potential customers.

## COUNT II
## BREACH OF CONTRACT—THIRD PARTY BENEFICIARY

51.     ZTE (USA) incorporates the allegations set forth in paragraphs 1-50, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

52.     As set forth above, InterDigital entered into express or implied contracts with ETSI, 3GPP, ITU, and their members, to grant licenses to its purportedly essential IPR on FRAND terms.

53.     InterDigital's contracts with these SSOs, and in particular InterDigital's commitments in the contracts to grant applicants licenses to its purportedly essential IPR on FRAND terms evince a clear intent that the contracts benefit ZTE (USA) and other third parties who might require a license to the Asserted Patents.

54.     These same contractual commitments create a duty on behalf of InterDigital to license its Asserted Patents on fair, reasonable, and non-discriminatory terms.

46

55.     It is only by InterDigital's fulfilling its promise to license the Asserted Patents on FRAND terms that ZTE (USA) will receive the intended benefit of being able to practice the implicated standards free from unreasonably high and discriminatory licensing demands.

56.     InterDigital has breached and continues to breach its contracts with ETSI, 3GPP, and ITU by refusing to license its purportedly essential IPR, including the Asserted Patents, to the contracts' third-party beneficiary, ZTE (USA), on FRAND terms.

57.     As a result of these multiple contractual breaches, ZTE (USA) has been injured, including in its business and property.  ZTE (USA) has been forced to expend resources resolving this licensing dispute, and is threatened, in particular, with irreparable loss of profits, loss of customers and potential customers, loss of goodwill and product image, and uncertainty among customers and potential customers.

## COUNT III
## EQUITABLE ESTOPPEL

58.     ZTE (USA) incorporates the allegations set forth in paragraphs 1-57, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

59.     InterDigital made clear and definite promises to potential licensees through its commitments to the various SSOs that-it would license its purportedly essential IPR, including the Asserted Patents, on FRAND terms.

60.     The intended purpose of InterDigital's promises was to induce reliance. InterDigital knew or should have reasonably expected that these promises would induce manufacturers and sellers of mobile wireless devices, like ZTE (USA), to develop, manufacture, and/or market products compliant with the relevant standards.

47

61.     ZTE (USA) has invested substantial monies in the applicable technology to market and/or sell products compliant with the relevant standards in reliance on InterDigital's promises, as described above.

62.     InterDigital is estopped from repudiating these promises under the doctrine of promissory estoppel.

63.     ZTE (USA) has been harmed and is threatened with irreparable harm as a result of its reasonable reliance on InterDigital's promises and the wrongful conduct of InterDigital.  ZTE (USA) has been forced to expend resources resolving this licensing dispute, and is threatened, in particular, with irreparable loss of profits, loss of customers and potential customers, loss of goodwill and product image, and uncertainty among customers and potential customers.

64.     ZTE (USA) lacks an adequate remedy at law.

## COUNT IV
## WAIVER OF RIGHT TO ENJOIN

65.     ZTE (USA) incorporates the allegations set forth in paragraphs 1-64, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

66.     SSOs, including ETSI, 3GPP, and ITU each have IPR Policies that require its members and participants in the standard-setting process to grant licenses to purportedly essential IPR on FRAND terms.

67.     InterDigital is and has been a member of these SSOs and has been a participant in their standards setting processes, including through participation in the promulgation of relevant mobile and wireless communication standards.

68.     By doing so, and by explicitly declaring the Asserted Patents to be essential, InterDigital implicitly and explicitly committed to license its IPR, including the Asserted Patents, on FRAND terms.

69.     By committing to license its purportedly essential IPR on FRAND terms, InterDigital has engaged in a course of conduct with regard to such IPR, including the Asserted Patents, that is inconsistent with an intent to enforce any injunctive or exclusionary rights that it may possess with regard to such purportedly essential IPR.

70.     As a result of InterDigital's conduct, ZTE (USA) reasonably believed, and reasonably relied on the belief, that InterDigital would not seek to enforce any injunctive or exclusionary rights with respect to its purportedly essential IPR, including the Asserted Patents, but rather would seek only to license such IPR on FRAND terms.

71.     ZTE (USA), in reliance upon this reasonable belief, made substantial investments in the applicable technology to market and/or sell products compliant with the relevant standards.

72.     InterDigital has waived any rights it may have had to seek any injunctive or exclusionary relief with respect to its purportedly essential IPR, including the Asserted Patents, that it committed, but failed, to license on FRAND terms.

## COUNT V
## DECLARATORY RELIEF:  INTERDIGITAL
## HAS NOT OFFERED LICENSES ON FRAND TERMS

73.     ZTE (USA) incorporates the allegations set forth in paragraphs 1-72, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

74.     There is an actual controversy between the parties concerning whether the terms on which InterDigital has offered to license its purported essential patents are fair, reasonable, and nondiscriminatory.

75.     The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

76.     ZTE (USA) is entitled to a declaratory judgment that InterDigital has not to date offered it licenses on FRAND terms.

RLF1 8350100v.1

## COUNT VI
## DECLARATORY RELIEF:  DETERMINATION OF FRAND LICENSE

77.     ZTE (USA) incorporates the allegations set forth in paragraphs 1-76, above, and

in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

78.     There is an actual controversy between the parties concerning FRAND terms for

InterDigital' s United States patents that have been declared essential to a standard used by any

of the products accused in the earlier filed cases or this action.

79.     The controversy is of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.

80.     ZTE (USA) is entitled to a declaratory judgment determining an appropriate

FRAND royalty for InterDigital's United States patents that have been declared essential to a

standard used by any of the products accused in the earlier filed cases or this action.

## COUNT VII
## NONINFRINGEMENT OF THE ASSERTED PATENTS

81.     ZTE (USA) incorporates the allegations set forth in paragraphs 1–80, above, and

in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

82.     An actual controversy exists between the parties with respect to infringement of

the Asserted Patents because InterDigital has brought this action against ZTE (USA) alleging

that ZTE (USA) infringes the Asserted Patents.

83.     ZTE (USA) has not and is not now infringing, contributorily infringing, or

inducing infringement of the Asserted Patents.

84.     ZTE (USA) is entitled to a judgment that ZTE (USA) does not infringe any claims

of the Asserted Patents.

## COUNT VIII
## INVALIDITY OF THE ASSERTED PATENTS

85.     ZTE (USA) incorporates the allegations set forth in paragraphs 1–84, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

86.     An actual controversy exists between the parties with respect to invalidity of the Asserted Patents because InterDigital has brought this action against ZTE (USA) alleging that ZTE (USA) infringes the Asserted Patents.

87.     The claims of the Asserted Patents are invalid under Section 101 of Title 35 of the United States Code as directed to non-statutory subject matter.

88.     The claims of the Asserted Patents are invalid under Sections 102 and/or 103 of Title 35 of the United States Code as anticipated or obvious in light of the prior art.

89.     The claims of the Asserted Patents are also invalid under the requirements of paragraph 1 of Section 112 of Title 35 of the United States Code due to a lack of written description, failure to particularly point out and distinctly claim the subject matters which are regarded as the alleged inventions, and/or failure to set forth written descriptions sufficient to enable any person skilled in the art to make and use the alleged inventions. In addition, the claims of the Asserted Patents are invalid under paragraph 2 of Section 112 of Title 35 of the United States Code because those claims are indefinite in that they contain ambiguous language and/or functional limitations that prevent a person skilled in the art from determining their full scope or meaning.

90.     ZTE (USA) is entitled to a judgment that the claims of the Asserted Patents are invalid.

RLF1 8350100v.1

## COUNT IX
## UNENFORCEABILITY OF THE ASSERTED PATENTS

91.     ZTE (USA) incorporates the allegations set forth in paragraphs 1–90, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

92.     An actual controversy exists between the parties with respect to unenforceability of the Asserted Patents because InterDigital has brought this action against ZTE (USA) alleging that ZTE (USA) infringes the Asserted Patents.

93.     The Asserted Patents are unenforceable under one or more of the equitable doctrines of patent misuse, unclean hands, equitable estoppel, promissory estoppel, implied license, and inequitable conduct.

94.     ZTE (USA) is entitled to a judgment that the Asserted Patents are unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, ZTE (USA) respectfully prays for relief as follows:

(a)     A judgment that InterDigital has breached its contracts with ZTE (USA) by failing to offer licenses on FRAND terms to purported essential IPR, including the Asserted Patents, ordering specific performance of these contracts, and awarding appropriate damages in an amount to be proven at trial;

(b)     A judgment that InterDigital has breached its contracts with the SSOs, harming ZTE (USA) as third-party beneficiary of those contracts, by failing to offer licenses on FRAND terms to purported essential IPR, including the Asserted Patents, ordering specific performance of these contracts, and awarding appropriate damages in an amount to be proven at trial;

(c)     A judgment that InterDigital is equitably estopped from seeking any relief from the United States International Trade Commission in the ITC Proceeding, or in any other

52

forum, for ZTE (USA)'s alleged infringement of InterDigital's purported essential IPR, including the Asserted Patents;

(d)   A judgment that InterDigital has waived any right it may have possessed to seek any relief from the United States International Trade Commission in the ITC Proceedings, or in any other forum, for ZTE (USA)' s alleged infringement of InterDigital' s purported essential IPR, including the Asserted Patents;

(e)   A declaratory judgment that InterDigital has not to date offered ZTE (USA) licenses on FRAND terms;

(f)   A declaratory judgment setting an appropriate FRAND royalty to license InterDigital's United States patents, including the Asserted Patents, that have been declared essential to a standard used by any products accused in the earlier filed case or in this action;

(g)   A declaratory judgment that ZTE (USA) does not infringe any claim of the Asserted Patents;

(h)   A declaratory judgment that the claims of the Asserted Patents are invalid;

(i)   A declaratory judgment that the Asserted Patents are unenforceable;

(j)   Awarding to ZTE (USA) the costs and disbursements of the action, including reasonable attorneys' fees; and

(k)   Such other relief as the Court may deem just and equitable.

|  |  |
|---|---|
| | _/s/ Kelly E. Farnan_ |
| OF COUNSEL: | Kelly E. Farnan (#4395) |
| Brinks Hofer Gilson & Lione | Farnan@rlf.com |
| NBC Tower, Suite 3600 | Travis S. Hunter (#5350) |
| 455 North Cityfront Plaza Drive | Hunter@rlf.com |
| Chicago, IL 60611 | Richards, Layton & Finger, P.A. |
| (312) 321-4200 | 920 N. King Street |
| | Wilmington, DE 19801 |
| Dated:  March 22, 2013 | _Attorneys for Defendant ZTE (USA) Inc._ |

53