## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERDIGITAL COMMUNICATIONS, INC., a Delaware corporation, INTERDIGITAL TECHNOLOGY CORPORATION, a Delaware corporation, IPR LICENSING, INC., a Delaware corporation, and INTERDIGITAL HOLDINGS, INC., a Delaware corporation, | |
| Plaintiffs | C.A. No. 13-009-RGA |
| v. | **JURY TRIAL DEMANDED** |
| ZTE CORPORATION, a Chinese corporation, and ZTE (USA) INC., a New Jersey corporation, | REDACTED -- PUBLIC VERSION |
| Defendants. | |

## ZTE CORP.'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFFS' AMENDED COMPLAINT

Defendant ZTE Corp. ("ZTE") hereby submits this Answer with Counterclaims to the Amended Complaint filed by Plaintiffs InterDigital Communications, Inc., InterDigital Technology Corporation, IPR Licensing, Inc., and InterDigital Holdings, Inc., (collectively "InterDigital" or "the Plaintiffs"). (D.I. 26.)  ZTE responds as follows:

### THE PARTIES

1.     ZTE admits on information and belief the allegations contained in paragraph 1.

2.     ZTE admits on information and belief the allegations contained in paragraph 2.

3.      ZTE admits on information and belief the allegations contained in paragraph 3.

4.      ZTE admits on information and belief the allegations contained in paragraph 4, except the allegations in footnote 1, for which ZTE lacks knowledge or information sufficient to form a belief about the truth thereof, and therefore denies the same.

5.      ZTE admits the allegations of paragraph 5.

6.      ZTE admits the allegations of paragraph 6.

## JURISDICTION AND VENUE

7.      ZTE admits that Plaintiffs purport to bring this action under 35 U.S.C. § 271 et seq.  ZTE further admits that this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

8.      ZTE does not contest venue in this District solely for the purposes of this case.  ZTE further does not contest that the Court has personal jurisdiction over ZTE solely for the purposes of this case.  All remaining allegations of paragraph 8 are denied.

9.      ZTE does not contest venue in this District solely for the purposes of this case.  ZTE further does not contest that the Court has personal jurisdiction over ZTE solely for the purposes of this case.  All remaining allegations of paragraph 9 are denied.

## THE PATENTS-IN-SUIT

10.      ZTE admits that Plaintiffs purport that there are four patents at issue in this action, that is, United States Patent Nos. 7,190,966 ("the '966 patent"), 7,286,847 ("the '847 patent"), 7,941,151 ("the '151 patent"), and 8,380,244 ("the '244 patent").

11.      ZTE admits that the '966 patent appears to be entitled "Method and Apparatus For Performing An Access Procedure."  ZTE further admits the '966 patent

appears to have been issued on March 13, 2007, naming inventors Fatih Ozluturk and Gary R. Lomp.  ZTE lacks knowledge or information sufficient to form a belief as to whether InterDigital owns by assignment the entire right, title, and interest in and to the '966 patent, but ZTE admits that InterDigital is listed as the assignee on the face of the '966 patent.  ZTE admits that Ex. A to the Amended Complaint appears to contain a copy of the '966 patent.  ZTE denies that the '966 patent is valid and enforceable.

12.     ZTE admits that the '847 patent appears to be entitled "Method and Apparatus For Performing An Access Procedure."  ZTE further admits the '847 patent appears to have been issued on October 23, 2007, naming inventors Fatih Ozluturk and Gary R. Lomp.  ZTE lacks knowledge or information sufficient to form a belief as to whether InterDigital owns by assignment the entire right, title, and interest in and to the '847 patent, but ZTE admits that InterDigital is listed as the assignee on the face of the '847 patent.  ZTE admits that Ex. B to the Amended Complaint appears to contain a copy of the '847 patent.  ZTE denies that the '847 patent is valid and enforceable.

13.     ZTE admits that the '151 patent appears to be entitled "Method and System For Providing Channel Assignment Information Used to Support Uplink And Downlink Channels."  ZTE further admits the '151 patent appears to have been issued on May 10, 2011, naming inventors Marian Rudolf, Stephen G. Dick, and Phillip J. Pietraski.  ZTE lacks knowledge or information sufficient to form a belief as to whether InterDigital owns by assignment the entire right, title, and interest in and to the '151 patent, but ZTE admits that InterDigital is listed as the assignee on the face of the '151 patent.  ZTE admits that Ex. C to the Amended Complaint appears to contain a copy of the '151 patent.  ZTE denies that the '151 patent is valid and enforceable.

14.     ZTE admits that the '244 patent appears to be entitled "Dual Mode Unit for Short Range, High Rate and Long Range, Lower Rate Data Communications."  ZTE further admits the '244 patent appears to have been issued on February 19, 2013, naming inventor Thomas E. Gorsuch.  ZTE lacks knowledge or information sufficient to form a belief as to whether IPR Licensing, Inc. owns by assignment the entire right, title, and interest in and to the '244 patent, but ZTE admits that IPR Licensing, Inc. is listed as the assignee on the face of the '244 patent.  ZTE admits that Ex. D to the Amended Complaint appears to contain a copy of the '244 patent.  ZTE denies that the '244 patent is valid and enforceable.

## COUNT I
## INFRINGEMENT OF THE '966 PATENT

15.     ZTE reasserts its answers to paragraphs 1-14 above as if fully set forth herein.

16.     ZTE denies the allegations of paragraph 16.

17.     ZTE admits that InterDigital asserted patents against ZTE in Investigation Number 337-TA-800 before the U.S. International Trade Commission.  ZTE admits that it has received the Amended Complaint.  ZTE denies the remaining allegations of paragraph 17.

18.     ZTE admits that at least some of the accused ZTE products identified by InterDigital to date are designed to be used in a 3G WCDMA system.  ZTE denies the remaining allegations in paragraph 18.

19.     ZTE denies the allegations in paragraph 19.

20.     ZTE denies the allegations in paragraph 20.

21.     ZTE denies the allegations in paragraph 21.

RLF1 9283408v.1

## COUNT II
## INFRINGEMENT OF THE '847 PATENT

22.     ZTE reasserts its answers to paragraphs 1-21 above as if fully set forth

herein.

23.     ZTE denies the allegations in paragraph 23.

24.     ZTE admits that InterDigital asserted patents against ZTE in Investigation

Number 337-TA-800 before the U.S. International Trade Commission.  ZTE admits that

it has received the Amended Complaint.  ZTE denies the remaining allegations of

paragraph 24.

25.     ZTE admits that at least some of the accused ZTE products identified by

InterDigital to date are designed to be used in a 3G WCDMA system.  ZTE denies the

remaining allegations of paragraph 25.

26.     ZTE denies the allegations of paragraph 26.

27.     ZTE denies the allegations of paragraph 27.

28.     ZTE denies the allegations of paragraph 28.

## COUNT III
## INFRINGEMENT OF THE '151 PATENT

29.     ZTE reasserts its answers to paragraphs 1-28 above as if fully set forth

herein.

30.     ZTE denies the allegations of paragraph 30.

31.     ZTE admits that it has received the Amended Complaint.  ZTE denies the

remaining allegations in paragraph 31.

32.     ZTE admits that at least some of the accused ZTE products identified by

InterDigital to date are designed to be used in a 4G wireless communications system and

to comply with the LTE standard.  ZTE denies the remaining allegations in paragraph 32.

5

33.     ZTE denies the allegations of paragraph 33.

34.     ZTE denies the allegations of paragraph 34.

35.     ZTE denies the allegations of paragraph 35.

## COUNT IV
## INFRINGEMENT OF THE '244 PATENT

36.     ZTE reasserts its answers to paragraphs 1-35 above as if fully set forth herein.

37.     ZTE denies the allegations of paragraph 37.

38.     ZTE admits it received an email from counsel for InterDigital on March 5, 2013 regarding the '244 patent. ZTE further admits that it has received the Amended Complaint.

39.     ZTE admits that at least some of the accused ZTE products identified by InterDigital to date are designed to be used in a 3G WCDMA or CDMA2000 system as well as in an IEEE 802 system.  ZTE denies the remaining allegations in paragraph 39.

40.     ZTE denies the allegations of paragraph 40.

41.     ZTE denies the allegations of paragraph 41.

42.     ZTE denies the allegations of paragraph 42.

## JURY DEMAND

43.     The allegations in paragraph 43 do not require a response.  ZTE demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

44.     ZTE denies that InterDigital is entitled to any relief.

RLF1 9283408v.1

## AFFIRMATIVE DEFENSES

ZTE asserts the following affirmative and other defenses listed below.  ZTE reserves the right to seek to amend, modify, and/or expand these defenses and to take further positions that are consistent with the facts discovered in this case.

### First Affirmative Defense:
### Non-Infringement

1.      ZTE does not infringe any valid and enforceable claim of the Asserted Patents.  ZTE does not practice any asserted claims of the Asserted Patents.

### Second Affirmative Defense:
### Invalidity

2.      The asserted claims of the Asserted Patents are invalid for failure to meet the conditions of patentability set forth in 35 U.S.C. §§ 101,102, 103, and/or 112.

### Third Affirmative Defense:
### Prosecution Laches

3.      InterDigital's claims are barred in whole or in part by delay in prosecuting the patent applications that matured into the Asserted Patents.

4.      One or more of the Asserted Patents claims benefit under 35 U.S.C. § 120 to an application having a purported filing date of more than ten years before the date InterDigital instituted this action.

5.      InterDigital, based on its representations that one or more of the Asserted Patents claim benefit under 35 U.S.C. § 120 to a series of continuation applications, could have claimed the subject matter now recited in the asserted claims of one or more of the Asserted Patents at any time since the respective, purported effective filing date(s) the Asserted Patent(s).

### Fourth Affirmative Defense:
### Prosecution History Estoppel

6.      By reason of acts, admissions, and statements before the USPTO made by or on behalf of applicants for the Asserted Patents during prosecution of the patent applications that matured into the Asserted Patents, InterDigital is estopped from claiming ZTE infringes one or more of the Asserted Patents.

### Fifth Affirmative Defense:
### Patent Misuse

7.      On information and belief, InterDigital is barred from asserting the Asserted Patents by the equitable doctrine of patent misuse.  InterDigital is a member of the relevant standards-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), the 3rd Generation Partnership Project ("3GPP"), and the International Telecommunications Union ("ITU").  The Intellectual Property Rights Policies ("IPR Policies") of these SSOs require each member to identify all patents the member holds that may be essential to compliance with a proposed technology standard and state whether it will license such patents on fair, reasonable and non-discriminatory ("FRAND") terms and conditions.  Having declared to the SSOs that the Asserted Patents are essential to standards, InterDigital failed to comply with their obligations under the IPR Policies, including by failing to propose FRAND terms for the Asserted Patents it claims are essential and by seeking injunctive and/or exclusionary relief against ZTE, a willing licensor.

### Sixth Affirmative Defense:
### Breach of Contract

8.      InterDigital breached its undertakings and obligations to SSOs including ETSI, 3GPP, and ITU, as well as to ZTE as beneficiary of such undertakings and

8

obligations, by seeking to enjoin or exclude ZTE from importing or selling products that

allegedly practice the Asserted Patents, and by failing to negotiate in good faith, offer and

grant FRAND terms and conditions for licensing the Asserted Patents.

**Seventh Affirmative Defense:**
**Unclean Hands**

9.      The Asserted Patents are void and unenforceable by reason of the

equitable doctrine of unclean hands based (among other things) on InterDigital's

participation in SSOs including ETSI, 3GPP, and ITU, InterDigital's failure to comply

with its commitments and obligations under the IPR Policies of these SSOs,

InterDigital's efforts to enjoin or exclude ZTE from importing and selling products that

allegedly practice the Asserted Patents, and InterDigital's refusal to offer FRAND terms

for the Asserted Patents it claims are essential.

**Eighth Affirmative Defense:**
**Express or Implied License**

10.      InterDigital is barred from asserting the Asserted Patents because ZTE is

expressly or impliedly licensed to practice the Asserted Patents as a result of

InterDigital's participation in SSOs including ETSI, 3GPP, and ITU, its commitments

and obligations under the IPR Policies of these SSOs to license the Asserted Patents

according to FRAND terms and conditions, and ZTE's willingness to enter into a license

on FRAND terms and conditions.

**Ninth Affirmative Defense:**
**Inequitable Conduct**

12.      On information and belief, as alleged below, the '151 Patent, including all

of the claims asserted against ZTE, is unenforceable under the doctrine of inequitable

conduct.

9

13.     In particular, during prosecution of the '151 Patent, at least two of the three named inventors, Marian Rudolf and Stephen Dick, deliberately withheld printed publications demonstrating that the subject matter of one or more claims of the '151 Patent was invented earlier by other participants in the organization responsible for developing the LTE cellular standard.  If those publications had been disclosed to the Patent and Trademark Office (PTO), as required by rules of PTO practice, one or more claims of the '151 Patent would not have been allowed.

14.     Marian Rudolf, Stephen Dick and Phillip J. Pietraski are listed as inventors on the '151 Patent.

15.     The '151 Patent claims priority to a provisional application filed on Nov. 18, 2003.

16.     InterDigital Technology Corporation is identified as the assignee on the face of the '151 Patent.

17.     Cellular standards, such as the LTE standard that InterDigital accuses of infringing the '151 Patent, are developed by "Standards-Setting Organizations" (SSOs), made up of participants from companies, such as InterDigital and the Respondents in this investigation, that do business in the cellular space.

18.     Cellular standards are complex, and govern many aspects of the operation of cellular devices and cellular network equipment.  Each section of a standard is developed by a "working group" with expertise in the technical field for that section.  For example, certain working groups have expertise in the efficient use of the radio frequency spectrum, and contribute to the portions of the standard that include the RF specification.

Other working groups have expertise in other areas, such as the way in which data is encoded for accurate and efficient transmission over the air.

19.     The working group responsible for developing the portion of the LTE standard accused of infringing the '151 Patent is called TSG Radio Access Network Working Group 1 ("TSG-RAN Working Group 1", hereinafter referred to as the "working group") and the group met on multiple occasions in 2002 and 2003 to discuss proposals for the standard under development at the time (high-speed uplink packet access).   Prior to each such discussion, the members of the working group drafted written submissions outlining their proposals.  Those submissions were distributed to all of the members of the working group, including representatives from InterDigital and at least two of the named inventors on the '151 Patent, Marian Rudolf and Stephen Dick.

20.     Two of the named inventors, Marian Rudolf and Stephen Dick, also attended many of the Working Group 1 meetings that occurred just before the '151 Patent's claimed priority date.  Marian Rudolf attended Working Group 1 meetings held on October 8, 2002, November 5, 2002, January 7, 2003, February 18, 2003, May 19, 2003, August 25, 2003, October 6, 2003, and November 7, 2003.  *See* Exs. 1-8.  Stephen Dick attended Working Group 1 meetings on October 8, 2002, November 5, 2002, August 25, 2003, and November 7, 2003.  *See* Exs. 1, 2, 6, 8.

21.     One of the issues addressed by Working Group 1 was how to efficiently assign network resources to multiple cellular devices, all of which need to send and receive data.  *See* Ex. 9.

22.     A cellular network shares the available transmission "bandwidth" (i.e., the network's capacity for sending and receiving data) among multiple cellular devices.  The

allocation of bandwidth is under the control of the cellular network; when a cellular telephone wants to send and receive data such as emails or text messages, it must first ask the network for a share of the available bandwidth.

23.     The network responds to the cellular telephone's request for bandwidth by sending messages on a special "channel" that is dedicated to sending "control" messages to cellular telephones, sometimes referred to as a control channel.

24.     In many cases, the control channel is shared by multiple cellular devices. When multiple cellular devices share a control channel, each device must be able to receive and interpret messages that are addressed to it.  The '151 Patent explains how that was done for the downlink control channel in the version of the standard (Release 5) that predates the one accused of infringement in this investigation.  In that previous version, called "HSDPA" the downlink control channel sent control messages out to multiple cellular devices, and distinguished among those devices by using a user specific identification.  '151 Patent at 1:24–28, 1:54–55 (describing the prior art "HSDPA" method of identifying a specific "WTRU" (UE) in an HS-SCCH transmission, as part of "Release 5 (R5)" WCDMA systems).  The user specific identification was used to mask a cyclic redundancy check (CRC) value.  *Id*.  This description of using a masked, device-specific CRC value is in the "Background" section of the specification of the '151 Patent, and was known in the prior art.  *Id.* at 1:24–2:12 (discussing alleged problems with prior art cellular systems, including the prior art HS-SCCH system employing the WTRU-specific CRC value.).

25.     It is possible to employ a first control channel for sending a message to a cellular device indicating when it is allowed to download data, also known as

12

"downlink," and a second control channel to instruct a cellular device when it may upload data, also known as "uplink."

26.     In late 2002 and early 2003, the working group discussed using a single control channel for sending messages to cellular devices about the assignment of both uplink and downlink bandwidth.  The single control channel under discussion during that time period would also be shared by multiple cellular devices.  It was therefore suggested that, when the network sent out messages on the control channel, each cellular device would successfully interpret only those messages that are addressed to it.

27.     In particular, in October, 2002, at a TSG-RAN Working Group 1 meeting attended by Marian Rudolf and Stephen Dick, Motorola submitted a proposal for how to use a single control channel to transmit control messages for both the uplink and downlink directions.  *See* Ex. 10 (hereinafter the "Motorola Proposal").  The Motorola Proposal is titled "Uplink enhancements for dedicated transport channels."

28.     The Motorola Proposal suggests using the control channel previously used for downlink transmissions—a control channel called the "HS-SCCH"—to send messages related both to downlink transmissions (on the downlink channel called the "HS-DSCH") and to uplink transmissions (on an uplink channel called "EUDTC").  The relevant passage is as follows:

> "6.     Control channel design to support EUDTC:
>
> One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC. This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH.  The second option is to define a new set of control channels to support EUDTC operation.  Finally, the third option is to use 10 msec frame size.  Further, the design of control channels when the UE is in soft-handoff should be addressed."

13

Motorola Proposal at 2 (emphasis added).

29.    As can be seen from the underlined portion, the Motorola Proposal suggests "piggyback[ing]" the uplink control information onto the existing downlink control channel, thus sharing the same control channel for messages pertaining to transmission in the uplink and downlink directions.

30.    The Motorola Proposal also defines how to do so:  by having a frame format for transmissions pertaining to the uplink direction that is different from the format used for transmissions pertaining to the downlink direction:  "This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."

31.    Finally, the Motorola Proposal make clear that it will "use the control channels for Rel-5 HS-DSCH" (i.e., the prior art "Release 5" version of the HSDPA standard) to distinguish between particular UEs receiving signals on the shard control channel.  As discussed above in the context of the admitted prior art in the Background section of the '151 Patent, the control channel used to govern transmission on the "HS-DSCH" in Release 5 of HSPDA—the HS-SCCH—used a UE-specific CRC value.

32.    In sum, the Motorola Proposal teaches using a single control channel for transmitting both uplink and downlink messages, distinguishing between uplink and downlink messages using different message "formats," and identifying a specific recipient for the message by using a device-specific CRC value as specified in the previous "Release 5" version of the standard.

33.    Marian Rudolf and Stephen Dick attended the Working Group 1 meeting at which the Motorola Proposal was presented and received copies of the Motorola Proposal.  Marian Rudolf and Stephen Dick were aware as of October 2002 that the scheme of using a single control channel for both the uplink and the downlink, and

14

distinguishing between uplink control transmissions and downlink control transmissions through the use of different message formats, was already invented by others. *See* Ex. 1.

34. In January 2003, at a TSG-RAN Working Group 1 meeting attended by Marian Rudolf, Siemens submitted a proposal for how to use a single "control channel" to transmit messages to multiple cellular devices and grant individual cellular devices permission to transmit in the uplink and downlink directions. *See* Ex. 11 (hereinafter the "Siemens Proposal").

35. The Siemens Proposal discloses using a single control channel to send both uplink and downlink control information. In particular, the Siemens Proposal suggests re-using the preexisting downlink control channel (the "HS-SCCH") to send messages pertaining both to the downlink channel (the "HS-DSCH") and to the uplink channel (the "EU-DCH"):

> 2. Re-use of HS-SCCH
>
> Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel). Consequently, EU-SCCH uses also a 3-slot format and is time-aligned at Node B with HS-SCCH transmissions. This particular format for EU-DCH associated downlink control information allows the same shared control channel to be used for EU-DCH and HSDPA users in time multiplex.

Siemens Proposal at 1 (emphasis added).

36. Moreover, the Siemens Proposal points out that transmissions pertaining to the downlink direction can be distinguished from transmissions pertaining to the uplink direction by making use of pre-existing data structures used to store the "channelisation code-set field" which previously contained 7 bits of data representing the channelization

15

code set.  *Id.*  By using a value for the channelization code set that was  "unused" in the previous version of the standard, the Siemens Proposal allows  the network to specify to a cellular device (referred to in the Siemens Proposal as "user equipment," or "UE") that the transmission relates to the uplink (EU-DCH) direction:  "As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as "redundant area" in Fig. 1, [1]), which could be used for EU-DCH downlink signalling."  *Id.*  Figure 1 is a table showing the unused codes, in the "Redundant area":



**Fig 1: Reuse of the redundant area of HS-SCCH part 1 for downlink signalling of EU-DCH**

37.    Finally, the Siemens Proposal suggests using the pre-existing HS-SCCH coding format to specify the particular user equipment ("UE") that is intended to receive the transmission.  "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. . . .  A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA and EU-DCH data transmission and receiver implementation is notably simplified."  Siemens Proposal at 1–2.  As discussed above, as admitted in the Background section of the '151 Patent, the existing

16

coding structure for HS-SCCH used a UE-specific CRC value that is generated from Part 1 and Part 2 of the HS-SCCH.

38.     In sum, the Siemens Proposal teaches using a single control channel for both uplink and downlink messages, distinguishing between uplink and downlink messages using different message "formats," and identifying a specific recipient for the message by using the preexisting coding structure of HS-SCCH, as specified in the previous HSDPA version of the standard.

39.     Marian Rudolf attended the Working Group 1 meeting at which the Siemens Proposal was presented and received copies of the Siemens Proposal.  Marian Rudolf was aware as of January 2003 that the scheme of using a single control channel for both the uplink and the downlink, by distinguishing between uplink control transmissions and downlink control transmissions through the use of the "unused" codewords in the previous version of the standard, was already invented by others.  *See* Ex. 3.

40.     InterDigital filed a provisional application with the PTO on November 18, 2003.  *See* Ex. 12 (hereinafter the "Provisional Application").  The Provisional Application is titled "Novel Resource Assignment Channel Configuration for Enhanced Uplink Operation."  *Id.* at 7.

41.     Like the Motorola Proposal and the Siemens Proposal, the Provisional Application describes a way to use a single shared control channel to send transmissions pertaining to both the downlink and uplink directions:  "The foregoing and other shortcomings of the prior art are resolved by providing a high speed shared control channel (HS-SCCH) and an uplink (UL) resource assignment channel· in a shared

17

downlink (DL) radio resource space, and by distinguishing received high speed shared

control channel (HS-SCCH) transmissions from uplink (UL) resource assignment

channel transmissions." Provisional Application ¶ 0018 (emphasis added here and in all

cases below).

42.     One of the preferred embodiments of the Provisional Application is

identical in all relevant respects to the shared control channel described in the Siemens

Proposal, and several embodiments use the Motorola Proposal's approach to

distinguishing between the uplink and downlink directions.

43.     Both the Motorola Proposal and the Provisional Application describe

using a single control channel that employs conventional HS-SCCH transmissions for the

downlink (i.e., the same transmissions used in the prior art Release 5 version of the

standard) and UL Resource Assignment transmissions for the uplink.  Likewise, both the

Siemens Proposal and the Provisional Application describe using a single control channel

that employs conventional HS-SCCH transmissions for the downlink (i.e., the same

transmissions used in the prior art version of the HSDPA standard) and UL Resource

Assignment transmissions for the uplink (emphasis added in all cases).

| Provisional Application | Motorola Proposal | Siemens Proposal |
| --- | --- | --- |
| "The foregoing and other shortcomings of the prior art are resolved by providing a high speed shared control channel (HS-SCCH) and an uplink (UL) resource assignment channel in a shared downlink (DL) radio resource space, and by distinguishing received high speed shared control channel (HS-SCCH) | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users.  This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH |

| | | |
|---|---|---|
| transmissions from uplink (UL) resource assignment channel transmissions." ¶ 0018. | | (denoted as EU-SCCH in the sequel)."  Siemens Proposal at 1. |

44.     In several embodiments of the Provisional Application, and in the Motorola Proposal, the UE can, in the phrasing used by the Provisional Application, "distinguish" between transmissions related to the downlink and transmissions related to the uplink by looking at the format of the frame transmitted on the shared control channel.  In at least the first, second, and third disclosed embodiments of the Provisional Application, the direction for the control signal is specified by the frame format.

| Provisional Application | Motorola Proposal |
|---|---|
| "Pursuant to the techniques of the present invention, any of several methods may be employed to distinguish HS-SCCH transmissions from DL Resource Assignment channel transmissions. These methods include: (a) channel indication by means of selecting one or more 'impossible' combinations in channelization code set mapping, (b) inversion of UE-specific cyclic redundancy check (CRC), (c) utilizing different UE-specific masking sequences . . ." Provisional Application ¶ 0020; *see generally* ¶¶ 0033–0035 (describing "Method 1," "Method 2," and "Method 3" for distinguishing between the uplink and downlink channels). | "This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. |

45.     Likewise, in the first embodiment of the Provisional Application, and in the Siemens Proposal, the UE can distinguish between transmissions related to the downlink and transmissions related to the uplink by using special values in an unused field in the previous version of the HSDPA standard.  Both the Provisional Application

19

and the Siemens Proposal explain how this distinguishing can take place:  by looking to

see whether one of the fields of the transmission—the "channelisation code-set" field—is

one of eight codewords that are "unused" or "impossible" in the prior art implementation:

| Provisional Application | Siemens Proposal |
|---|---|
| "Pursuant to the techniques of the present invention, any of several methods may be employed to distinguish HS-SCCH transmissions from DL Resource Assignment channel transmissions. These methods include: (a) channel indication by means of selecting one or more 'impossible' combinations in channelization code set mapping . . ." Provisional Application ¶ 0020; *see generally* ¶ 0033 (describing "Method 1" for distinguishing between the uplink and downlink channels, using "One or more 'Impossible' Combinations in the Channelization Code Set Mapping"). | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), which could be used for EU-DCH downlink signalling."  Siemens Proposal at 1. |

46.     Indeed, the figure used to depict the "impossible combinations" in the

Provisional Application is copied and pasted from the figure used in the Siemens

Proposal to depict the "8 unused codewords":

| Provisional Application | Siemens Proposal |
|---|---|
| |  |



Fig. 1

FIG. 2

47.     Finally, in both the Motorola Proposal and the Siemens proposal, the shared downlink channel relies on the same prior art method for confirming which UE a transmission is directed to that is used in the Provisional Application:  using the user-specific identification in the same manner it was used in the preexisting HS-SCCH structure.

| Provisional Application | Motorola Proposal | Siemens Proposal |
|---|---|---|
| "Confirmation that a demodulated transmission is intended for the UE is obtained using a UE-specific CRC."  ¶ 0025.<br><br>"The R5 HS-SCCH is sent . . . along with a UE-specific cyclic redundancy check (CRC) (see 3GPP TS25.212)."  ¶ 0008 (discussing the HS-SCCH in the prior art HSDPA system). | "One of the options for control channel design of EUDTC is to <u>use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC</u>.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used."<br><br>"A major benefit of the re-use of HS-SCCH channel and coding format is that <u>the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA</u> and EU-DCH data transmission and receiver implementation is notably simplified."  Siemens Proposal at 1–2. |

21

48.     Moreover, both the Provisional Application and the Siemens Proposal argue that transmitting uplink control messages on the same channel already used for downlink control messages has performance and efficiency benefits—namely, the UE can have reduced complexity and better performance because it only needs to monitor a single control channel.

| Provisional Application | Siemens Proposal |
|---|---|
| "In a straightforward extension of existing R5 mechanisms, UL Resource Assignment Channel's for FDD Enhanced UL could be introduced 'on top' of existing HS-SCCH's for HSDPA. In other words, a separate set of SF=128 DL channels are configured to contain one or more UL Resource Assignment Channels. With this approach, in a typical HSDPA operation scenario, a UE would then be required to monitor one or several UL Resource Assignment Channels in addition to the up to 4 HS-SCCHs it must already monitor." ¶ 0014.<br><br>"Relative to the prior art approaches described hereinbefore, a high speed shared control channel (HS-SCCH) and an uplink (UL) resource assignment channel that occupy a shared downlink (DL) radio resource space reduces UE complexity increases UE battery efficiency, and permits enhanced DL spreading code usage." ¶ 0019. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. . . . Additionally it decreases UE complexity, since less control channels need to be monitored in cases where HS-DSCH and EU-DCH are used concurrently."  Siemens Proposal at 1. |

49.     Thus the Provisional Application, like the Motorola Proposal and the Siemens Proposal, describes using a single control channel for both uplink and downlink messages, distinguishing between uplink and downlink messages using different message formats (including, as in the Siemens Proposal, different values for the "channelization

22

code set" field), and identifying a specific recipient for the message by using the pre-existing HS-SCCH coding structure, which included a device-specific CRC value.  And the Provisional Application and the Siemens Proposal cite precisely the same benefits from doing so.

50.     The Provisional Application also includes claims.  Claim 1 purports to cover the process already disclosed in the Motorola Proposal and the Siemens Proposal:

> 1.     A method for communicating with a user equipment (UE) over a wireless link comprised of a downlink (DL) and an uplink (UL), the method comprising the steps of:
>
> (a) sharing at least a portion of the DL so as to provide a high speed shared control channel (HS-SCCH) and an UL resource assignment channel, and
>
> (b) distinguishing received high speed shared control channel (HS-SCCH) transmissions from uplink (UL) resource assignment channel transmissions.

51.     This claim recites the same basic three elements already discussed:  a control channel for both "HS-SCCH" and "uplink (UL)" control messages; "distinguishing" transmissions related to the HS-SCCH from transmissions related to the uplink; and "sharing" the channel among multiple UEs.  This claimed process is identical to what is disclosed in the Motorola Proposal and the Siemens Proposal.

52.     InterDigital filed the nonprovisional application, which ultimately issued as the '151 Patent, on July 29, 2004.  *See* Ex. 13.  Both the Motorola Proposal and the Siemens Proposal describe preferred embodiments of the '151 Patent.  And like the Provisional Application, the '151 Patent includes material taken directly from the Siemens Proposal.

53.     In particular, both the '151 Patent and the Motorola Proposal describe using a single control channel that employs conventional HS-SCCH transmissions for the

downlink (i.e., the same transmissions used in the prior art Release 5 version of the

standard) and UL Resource Assignment transmissions for the uplink.  Likewise, both the

'151 Patent and the Siemens Proposal describe using a single control channel that

employs conventional HS-SCCH transmissions for the downlink (i.e., the same

transmissions used in the prior art version of the HSDPA standard) and UL Resource

Assignment transmissions for the uplink.

| 151 Patent | Motorola Proposal | Siemens Proposal |
|---|---|---|
| "The WTRU communicates with the Node-B via a common control channel, the UL channel and the DL channel. The WTRU receives a message from the Node-B via the common control channel. The message includes an indication of whether the message is intended for assigning radio resources to the UL channel or the DL channel." 2:20–25.<br><br>"The Node-B 104 is configured to support an HSDPA and EU operation. Therefore, each Node-B 104 dynamically allocates radio resources for DL and UL transmissions to and from the WTRU 106 through an HS-DSCH and an EU channel, respectively. The radio resources assignment information for both the HS-DSCH and the EU is transmitted through the common control channel | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel)."  Siemens Proposal at 1. |

| | | |
|---|---|---|
| 112." 3:33–39.<br><br>"High speed downlink packet access (HSDPA) has been developed to increase downlink (DL) efficiency and throughput in universal mobile telecommunication system (UMTS) Release 5 (R5) wideband code division multiple access (W-CD MA) systems. . . . The signaling channel, a high speed shared control channel (HS-SCCH), conveys radio resource allocation information to a plurality of wireless transmit/receive units (WTRUs)." 1:33–36. | | |

54.     In several embodiments of the '151 Patent, as in the Motorola Proposal, the UE can distinguish between transmissions related to the downlink and transmissions related to the uplink by looking at the format of the frame transmitted on the shared control channel.  In at least the first, second, and third disclosed embodiments of the '151 Patent, the direction for the control signal is specified by the frame format.

| 151 Patent | Motorola Proposal |
|---|---|
| "In accordance with a first embodiment of the present invention, an indication that a particular radio resource is assigned for a UL transmission is provided by means of one or more of the impossible combinations in the channelization code set mapping in a current HSDPA." 3:51–55.<br><br>"In accordance with the second embodiment of the present invention, this WTRU-specific CRC is modified in a unique and deterministic way to indicate | "This can be achieved by defining an additional frame format for <u>HS-SCCH</u> and HS-DPCCH."  Motorola Proposal at 2. |

25

| | |
|---|---|
| that the demodulated transmission is for UL transmission, rather than DL transmission." 4:13–16.<br><br>"In accordance with a third embodiment of the present invention, an indication that a particular radio resource is assigned for an EU is provided by means of a WTRU - specific<br>masking sequence." 4:28–31. | |

55.     Also, as in the Siemens Proposal, the '151 Patent describes distinguishing

between transmissions related to the downlink and transmissions related to the uplink,

using the channelization code-set field.

| 151 Patent | Siemens Proposal |
|---|---|
| "In accordance with a first embodiment of the present invention, an indication that a particular radio resource is assigned for a UL transmission is provided by means of one or more of the impossible combinations in the channelization code set mapping in a current HSDPA. FIG. 2 is a look-up table for channelization code set mapping currently used in the HSDPA." 3:51–57. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), which could be used for EU-DCH downlink signalling."  Siemens Proposal at 1. |

56.     Figure 2 from the '151 Patent is carried over from Figure 2 of the

Provisional Application, which in turn is taken from Figure 1 of the Siemens Proposal.

| 151 Patent | Siemens Proposal |
|---|---|
| | |

26



57.     Finally, in both the Motorola Proposal and the Siemens proposal, the shared downlink control channel relies on the same prior art method for determining which UE a transmission is directed to that is used in the '151 Patent:  preexisting structure of the HS-SCCH and specifically the use of user specific identification (UE-ID), which was used in the preexisting structure to mask the CRC.

| 151 Patent | Motorola Proposal | Siemens Proposal |
|---|---|---|
| "In accordance with a second embodiment of the present invention, an indication that a particular radio resource is assigned for UL transmission is provided by means of a WTRU-specific CRC. Under current HSDPA specifications, a WTRU-specific CRC is contained in an HS-SCCH field 2. A 16-bit CRC is computed from the information to be transmitted, and the computed CRC is masked with a unique 16-bit WTRU identity (ID). The masked CRC is transmitted to a | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used."<br><br>"A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for HSDPA and EU-DCH data transmission and receiver implementation is notably simplified."  Siemens Proposal at 1–2. |

| | | |
|---|---|---|
| WTRU 106 as a WTRU-specific CRC."  4:4–12. | | |

58.    As with the Provisional Application, the '151 Patent argues that transmitting uplink control messages on the same channel already used for downlink control messages has the performance and efficiency benefits discussed in the Siemens Proposal—namely, the UE can have reduced complexity and better performance because it only needs to monitor a single control channel.

| 151 Patent | Siemens Proposal |
|---|---|
| "Thus, it is possible to introduce a separate set of SF=128 DL channels as UL resource assignment channels. With this approach, a WTRU would be required to monitor one or more UL resource assignment channels in addition to the HS-SCCHs for an HSDPA operation. Although this approach is conceptually simple, there are many disadvantages with this scheme, such as WTRU complexity, WTRU battery efficiency, and DL spreading code usage." 2:3–9 (describing disadvantages of using two separate control channels, which are alleged to be overcome by the claimed invention). | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. . . .  Additionally it decreases UE complexity, since less control channels need to be monitored in cases where HS-DSCH and EU-DCH are used concurrently."  Siemens Proposal at 1. |

59.    Moreover, at least asserted independent claims 1 and 16 purport to cover the process already disclosed in the Motorola Proposal and in the Siemens Proposal.

60.    The Motorola Proposal and the Siemens Proposal disclose a control channel for both downlink and uplink channel assignment information:

28

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 1. A method for utilizing channel assignment information for an uplink shared channel or a downlink shared channel, the method comprising: a wireless transmit/receive unit (WTRU) receiving downlink control information including downlink or uplink channel assignment information via a same physical downlink control channel, both downlink channel assignment information and uplink channel assignment information being received via the same physical downlink control channel; | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel)."  Siemens Proposal at 1. |

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 16. A wireless transmit/receive unit (WTRU) for utilizing channel assignment information for an uplink shared channel or a downlink shared channel, the WTRU comprising: a receiver configured to receive downlink control information including downlink or uplink channel assignment information via a same physical downlink control channel, both downlink channel assignment information and uplink channel assignment information being received | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "Re-using the existing HSDPA downlink control channel (HS-SCCH) is a means to alleviate the downlink code resource problem by providing trunking gain between EU-DCH and HS-DSCH users. This is achieved by reusing the downlink HS-SCCH also for downlink control information of EU-DCH (denoted as EU-SCCH in the sequel)."  Siemens Proposal at 1. |

29

| | | |
|---|---|---|
| via the same physical downlink control channel; | | |

61.    The Motorola Proposal and the Siemens Proposal disclose "determining" whether the downlink control information is intended for the UE.

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 1. …the WTRU determining whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for <u>HS-SCCH</u> and HS-DPCCH."  Motorola Proposal at 2; *see* '151 Patent at 1:24–2:12 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. . . .  A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and decoding of part 1 is identical for <u>HSDPA</u> and EU-DCH data transmission and receiver implementation is notably simplified."  Siemens Proposal at 1–2; *see* '151 Patent at 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 16. … a controller configured to determine whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for <u>HS-SCCH</u> and HS- | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. . . .  A major benefit of the re-use of HS-SCCH channel and coding format is that the detection based on the implicit UE-ID and |

30

| | DPCCH."  Motorola Proposal at 2; *see* '151 Patent at 1:24–2:12 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). | decoding of part 1 is identical for <u>HSDPA</u> and EU-DCH data transmission and receiver implementation is notably simplified." Siemens Proposal at 1–2; *see* at 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |
|---|---|---|

62.    As discussed above, it was known in the admitted prior art (described in the '151 Patent) that the existing "HSDPA" specifications use a WTRU-specific CRC in the "HS-SCCH" channel to identify transmissions intended for a particular WTRU.

| Claims | Meaning of "HSDPA" to a Person of Ordinary Skill in the Art |
|---|---|
| 1. …the WTRU determining whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "Under current HSDPA specifications a WTRU-specific CRC is contained in an HS-SCCH field 2." '151 Patent 4:7–8; *id.* 1:49–55 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU); *id.* 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |

| Claims | Meaning of "HSDPA" to a Person of Ordinary Skill in the Art |
|---|---|
| 16. … a controller configured to determine whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits… | "Under current HSDPA specifications a WTRU-specific CRC is contained in an HS-SCCH field 2." '151 Patent 4:7–8; *id.* 1:49–55 (indicating that the "HS-SCCH" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU); *id.* 1:24–2:12 (indicating that "HSDPA" uses a CRC value specific to a WTRU to distinguish transmissions to that WTRU). |

31

63.    The Motorola Proposal and the Siemens Proposal disclose "determining"

whether the channel assignment information is for uplink or downlink and utilizing that

information:

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 1. … if so determining whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel; and the WTRU utilizing the radio resources for the uplink shared channel or the downlink shared channel. | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), which could be used for EU-DCH downlink signalling." Siemens Proposal at 1. |

| Claims | Motorola Proposal | Siemens Proposal |
|---|---|---|
| 16. … determine whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel, and utilizing the radio resources for the uplink shared channel or the downlink shared channel. | "One of the options for control channel design of EUDTC is to use the control channels for Rel-5 HS-DSCH to piggyback the control information required for EUDTC.  This can be achieved by defining an additional frame format for HS-SCCH and HS-DPCCH."  Motorola Proposal at 2. | "A further simplification of the UE implementation is possible if exactly the coding format of HS-SCCH part 1 is re-used. This is possible if the signalling payload is four bits or less. As shown in Fig. 1, the HS-SCCH part 1 provides 8 unused codewords within the channelisation code-set field (denoted as 'redundant area' in Fig. 1, [1]), which could be used for EU-DCH downlink signalling." Siemens Proposal at 1. |

32

64.     On information and belief, but for the applicants' deliberate decision to withhold the Motorola Proposal and the Siemens Proposal from the '151 Patent examiner, the PTO would not have allowed at least asserted claims 1 and 16 of the '151 Patent.  The Motorola Proposal and the Siemens Proposal, by themselves or in combination with the admitted prior art, disclose each and every element of these claims—indeed, the Siemens Proposal teaches the specific method of distinguishing between uplink and downlink used in an embodiment of the '151 Patent, and describes that method using precisely the same figure.

65.     On information and belief, the decision to withhold the Motorola Proposal and the Siemens Proposal was deliberate, and made with fraudulent intent.  At least inventors Marian Rudolf and Stephen Dick were specifically aware of the Motorola Proposal, as they attended the Working Group 1 meeting at which the Motorola Proposal was presented.  At least inventor Marian Rudolf was specifically aware of the Siemens Proposal, as he attended the Working Group 1 meetings at which the Siemens Proposal was presented.  In addition, 3GPP working group documents for any given meeting are distributed prior to the meeting to the appropriate working group or to those persons registered as regular participants—including other named inventors on the '151 Patent. Given that multiple inventors were actively involved with TSG-RAN Working Group 1 and regularly attended Working Group 1 meetings, they were clearly aware of the Siemens Proposal and the Motorola Proposal.

66.     The inventors' awareness of the Motorola Proposal is also evident from the inclusion of a related Motorola submission in the cited prior art for the '151 Patent. In particular, the cited prior art for the '151 Patent includes a publication titled "3GPP

33

TSG RANWG 1 Tdoc R1-02-1350, Motorola, 'Design Considerations for Enhanced

Uplink Dedicated Channel,' Shanghai, China, Nov. 2002." '151 Patent at p. 2.  The 1350

proposal cites the Motorola Proposal discussed above.  *See* Ex. 14 at 1, 5.

67.    The inventors' awareness of the Siemens Proposal is also evident from the

Provisional Application and the specification of the '151 Patent themselves, which (as

already discussed) take the idea of using the "unused" values of the channelization code-

set field and the figure used to illustrate that idea directly from the Siemens Proposal.

68.    On information and belief, knowing that disclosing the Motorola Proposal

and /or the Siemens Proposal would prohibit obtaining a patent, at least inventor Rudolf

and inventor Dick made the conscious choice not to disclose the prior art to the PTO.

The inventors disclosed several working group documents to the Examiner from other

meetings attended by the inventors and occurring around the same time as the Motorola

Proposal and the Siemens Proposal—including the related 1350 proposal—but at least

Marian Rudolf and Stephen Dick chose not to disclose the Motorola Proposal and the

Siemens Proposal to the PTO.

69.    For example, both Marian Ruldolf and Stephen Dick attended the

Working Group 1 meeting in Shanghai, China, held November 2002, and disclosed the

following working documents associated with this meeting to the PTO: (1) Tdoc R1-02-

1277, Nokia, "Two Threshold Node B Packet Scheduling," Shanghai, China, Nov. 2002;

(2) Tdoc R1-02-1350, Motorola, "Design Considerations for Enhanced Uplink Dedicated

Channel," Shanghai, China, Nov. 2002; and (3) Tdoc R1-02-1277, Nokia, "Two

Threshold Node B Packet Scheduling," Shanghai, China, Nov. 2002.  *See* Ex. 2.

However, Marian Rudolf and Stephen Dick attended the Working Group 1 meeting

34

preceding the Shanghai meeting, held October 2002 in Espoo Finland, and chose not to

disclose the highly relevant Motorola Proposal.  And Marian Rudolf attended the

Working Group 1 meeting following the Shanghai meeting, held January 2003 in San

Diego, California, and chose not to disclose the highly relevant Siemens Proposal.  *See*

Ex. 3.

70.     The deliberate choice by at least Marian Rudolf to use material taken from

the Siemens Proposal in the first described embodiment of the '151 Patent, and the choice

to disclose to the USPTO other Working Group materials while withholding the Siemens

Proposal, demonstrate fraudulent intent.  The deliberate choice of at least Marian Rudolf

and Stephen Dick to disclose certain Working Group submissions, including the

Motorola 1350 proposal, while withholding the directly relevant Motorola Proposal,

demonstrates fraudulent intent.  The pattern of withholding multiple prior art references

that disclose the use of a single control channel and the other requirements of at least

claims 1 and 16 of the '151 Patent further demonstrates fraudulent intent.  On

information and belief, the inventors, including at least Marian Rudolf and Stephen Dick,

withheld the Motorola Proposal and the Siemens Proposal with the intent of hiding from

the PTO that the alleged inventions of at least claims 1 and 16 of the '151 Patent were not

invented by the named inventors, but rather were taken from the prior work of others.  As

discussed above, but for the inventors' failure to disclose the Motorola Proposal and the

Siemens Proposal, at least claims 1 and 16 of the '151 Patent would not have issued.

71.     ZTE is continuing to obtain and review information related to the large

family of U.S. and foreign patents and publications related to the asserted patent, and

accordingly, ZTE intends to set forth further allegations regarding the inequitable conduct associated with the procurement of the asserted patent as discovery continues.

## COUNTERCLAIMS

Pursuant to Federal Rule of Civil Procedure 13, ZTE pleads the following counterclaims against Plaintiff/Counterclaim Defendants InterDigital Communications, Inc., InterDigital Technology Corporation, IPR Licensing, Inc., and InterDigital Holdings, Inc. (collectively "InterDigital").

## NATURE OF THE ACTION

1.      ZTE brings this action to enforce contractual commitments made by InterDigital to license on Fair, Reasonable and Non-Discriminatory ("FRAND") terms patents that InterDigital claims are essential to various 3G and/or 4G wireless standards. In breach of those commitments, InterDigital has failed to negotiate in good faith toward a FRAND license with ZTE and has failed to offer and grant a FRAND license to ZTE.

2.      In further breach, InterDigital filed a complaint on July 26, 2011 which initiated an investigation before the United States International Trade Commission, Inv. No. 337-TA-800 (the "800 ITC Proceeding").  InterDigital filed another complaint on January 2, 2013, initiating a new investigation before the ITC, (the "868 ITC Proceeding").  Through these proceedings (collectively, the "ITC Proceedings"), InterDigital seeks to harm irreparably ZTE's substantial business by enjoining importation of its products, and seeks to extract unfair and unreasonable license terms. Yet, by virtue of its FRAND commitments, InterDigital effectively agreed to forego injunctions or exclusionary relief against parties willing to agree to FRAND license terms with respect to valid and essential patents they use, as ZTE is willing to do.

3.      ZTE seeks enforcement of InterDigital's contractual commitment to license its standards-essential patents on FRAND terms, and a determination of an appropriate FRAND royalty rate for InterDigital's U.S. 3G and/or 4G patent portfolios. ZTE will pay that FRAND royalty for IDC's 3G and 4G patent portfolio if determined by this court.  ZTE also seeks a declaration that the patent claims asserted in this action are not infringed, invalid, and unenforceable.

## THE PARTIES

4.      ZTE is a Chinese corporation with its principal place of business in at ZTE Plaza, No. 55 Hi-Tech Road South, Hi-Tech Industrial Park, Nanshan District, Shenzhen, Guangdong Province 518057, China.  ZTE sells a range of electronic devices including mobile communication and media devices globally.

5.      Counterclaim Defendant InterDigital Communications, Inc. is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

6.      Counterclaim Defendants InterDigital Technology Corporation is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

7.      Counterclaim Defendant IPR Licensing, Inc. is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

RLF1 9283408v.1

8.      Counterclaim Defendant InterDigital Holdings, Inc. is a Delaware corporation with its principal place of business in Delaware, and is a complainant in the ITC Proceedings.

## BACKGROUND OF THE COUNTERCLAIMS

9.      ZTE's counterclaims seek redress for InterDigital's breach of contractual commitments InterDigital made to international standards-setting organizations ("SSO's") to license its declared-essential patents on terms that are fair, reasonable, and non-discriminatory or reasonable and demonstrably free of unfair discrimination (collectively "FRAND").  InterDigital has breached those commitments and acted in bad faith by: (i) seeking exclusion orders against ZTE, a willing licensee, at the United States International Trade Commission ("ITC") on FRAND-encumbered patents; (ii) refusing to offer ZTE a license on FRAND terms after years of negotiations and even after InterDigital seeks to block ZTE from practicing the relevant standards using FRAND-encumbered patents; (iii) rejecting ZTE's own offers for a license on FRAND terms and continuing to pursue exclusionary relief; and (iv) continuing to seek exclusionary relief after rejecting all of ZTE's efforts to have this Court resolve the parties' disagreement over FRAND terms for a license to InterDigital's FRAND-encumbered patents.  ZTE also seeks declaratory relief establishing the parties' respective rights and obligations under InterDigital's FRAND licensing commitments, including a determination of FRAND license terms for certain of InterDigital's FRAND-encumbered patents.

10.      InterDigital is a publicly-traded, patent licensing company that derives almost all of its revenues from license agreements with manufacturers of cellular devices.

InterDigital claims to hold a broad portfolio of patents that it contends are essential to certain cellular telecommunications standards, including the standards for third-generation ("3G") and fourth-generation ("4G") cellular network technologies. InterDigital has claimed that it holds patents essential to these 3G and 4G cellular standards in SEC filings, investor conference calls, ███████████████, and in court filings where InterDigital has asserted its patents against standards-compliant products based solely on their compliance with the standard. ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████[1]  ███████████████████████████

███████████████

11.    The standards-setting organizations ("SSO's") that promulgate the 3G and 4G cellular standards – namely, the European Telecommunications Standards Institute ("ETSI"), the International Telecommunications Union ("ITU") and the Telecommunications Industry Association ("TIA") all seek to avoid situations where patent holders can use their standards-essential patents ("SEP's") to enjoin or block the

---

[1] The '406 patent, '013 patent, and '830 patent were asserted against ZTE in the 800 Investigation and in C.A. 11-654-RGA and are asserted against Samsung in the 868 Investigation and in C.A. 13-00011-RGA. The '151 patent is asserted against ZTE in this action and against the other Defendants in the related actions. *See* D.I. 26; Amended Compls. in C.A. 13-00008-RGA (Huawei); C.A. 13-00010-RGA (Nokia); C.A. 13-00011-RGA (Samsung).

manufacture of standards-compliant products and either extract excessive royalties or prevent the standard from being widely adopted.  This potential danger is commonly referred to as "patent hold-up" and SSO's like ETSI, ITU, and TIA have adopted intellectual property rights policies ("IPR Policies") to address the dangers of patent hold-up and potential abuses of SEP's.

12.    InterDigital and ZTE are both members of ETSI, ITU, and TIA.  As a result, InterDigital is obligated to comply with those organizations rules and bylaws, including their IPR Policies.

13.    One tool adopted by ETSI, ITU, and TIA to avoid patent hold-up is to set up mechanisms to identify potential SEPs and obtain binding, contractual commitments from patent owners to grant manufacturers of standards-compliant equipment licenses to SEP's on FRAND terms.  Under the IPR Policies of ETSI, ITU, and TIA, if an SEP is identified but the patent owner is unwilling to make a binding and enforceable commitment to license its SEPs on FRAND terms, then the SSO is generally required to investigate changes to the standard that would avoid the SEP and make it no longer essential.

14.    Pursuant to the ETSI, ITU, and TIA IPR Policies, InterDigital has identified SEPs that it believes it holds for the 3G and 4G cellular standards, and InterDigital has voluntarily entered into binding and enforceable FRAND-licensing commitments for a large portion of its patent portfolio.  In those FRAND licensing commitments, InterDigital specifically identified particular patents or described the categories of patents it believes to be SEP's and stated that it is "prepared to grant" licenses for those patents on FRAND terms to manufacturers of standards-compliant

equipment.  Federal district and appellate courts have repeatedly held that FRAND

licensing commitments like the ones given by InterDigital rise to the level of binding and

enforceable contracts to (i) grant licenses on FRAND terms and conditions; and (ii)

refrain from enjoining parties who are willing to take a license and pay FRAND

compensation for utilizing declared-essential patents.  *See Microsoft Corp. v. Motorola,*

*Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. 2012); *Microsoft Corp. v. Motorola, Inc.,*

696 F.3d 872, 884 (9th Cir. 2012)*; Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 914

(N.D. Ill. 2012); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-1846, 2012 WL

1672493 at *11-12 (N.D. Cal. May 14, 2012); *Apple Inc. v. Motorola Mobility*, No. 11-

cv-178, 2011 WL 7324582, at *9 (W.D. Wis. June 7, 2011); *Research in Motion Ltd. v.*

*Motorola, Inc.*, 644 F. Supp. 2d 788, 791, 797 (N.D. Tex. 2008); *Ericsson Inc., v.*

*Samsung Elecs. Co., Ltd.*, No. 06-cv-63, 2007 WL 1202728, at *1 (E.D. Tex. Apr. 20,

2007); *Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-3451, 2012 WL 4845628, at

*4-5 (N.D. Cal. Oct. 10, 2012); *ESS Tech., Inc. v. PC-TEL, Inc.*, No. C-99-20292-RMW,

1999 WL 33520483, at *3-4 (N.D. Cal. Nov. 4, 1999).

15.    Despite its protestations to the contrary in this case and in other litigation

between the parties at the ITC, InterDigital apparently agrees with the federal courts on

the contours of its FRAND-licensing commitments on both points.  For example,

InterDigital described its FRAND licensing commitments to SSOs as follows in its 2012

10-K filing with the Securities and Exchange Commission:

> In conjunction with our participation in certain standards bodies,
> we have filed declarations stating that we have patents that we
> believe are or may be essential or may become essential to cellular
> and other wireless standards and that *we agree to make such*
> *patents available for use and license* on fair, reasonable and non-

discriminatory terms or similar terms consistent with the requirements of the respective standards organizations.

Ex. 17, Excerpt from InterDigital's Form 10-K filed February 2012, at

IDC868ITC50086878.

16. ███████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
█████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
██████

17. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████



19.

RLF1 9283408v.1



20.     Like the federal courts that have reviewed the issues, antitrust enforcers

likewise believe that obtaining injunctions on FRAND-encumbered patents against

willing licensees is a form of patent hold-up that is inconsistent with a patent holder's

FRAND licensing commitments.  For example, the Federal Trade Commission ("FTC")

stated in a recent consent order entered into with Bosch that:

> [T]here is increasing judicial recognition, coinciding with
> the view of the Commission, of the tension between
> offering a FRAND commitment and seeking injunctive
> relief.  Patent holders that seek injunctive relief against
> willing licensees of their FRAND-encumbered SEPs should
> understand that in appropriate cases the Commission can
> and will challenge this conduct as an unfair method of
> competition under Section 5 of the FTC Act.

*In the Matter of Robert Bosch GmbH*, FTC File No. 121-0081, Statement of the Federal

Trade Commission at 2 (Nov. 26, 2012).  Following the consent order in the Bosch

matter, the FTC entered into another consent order with Google/Motorola in which

Google/Motorola agreed that it would not obtain injunctions (including ITC exclusion

orders) against willing licensees using FRAND-encumbered patents.  *See* Decision and

Order, FTC File No. 121-0120, In the Matter of Motorola Mobility LLC and Google Inc.

44

In the consent order, the FTC defined an unwilling licensee in fairly narrow terms as a party that

      (i)       is outside of the jurisdiction of U.S. courts;

      (ii)      states in writing or sworn testimony that it would not license the FRAND-encumbered patent on any terms (and this expressly excluded disputes by the licensee over "validity, value, Infringement or Essentiality" of a FRAND-encumbered patent);

      (iii)     refused to enter into a license agreement covering FRAND-encumbered patents on terms set by a court or in an arbitration; or

      (iv)     failed to provide specific written confirmation to the patent holder regarding a willingness to actually take a license on FRAND terms.

With regard to ZTE's negotiations with InterDigital, ZTE does not satisfy any of these criteria and does not qualify as an unwilling licensee. Indeed, ZTE is filing these very counterclaims seeking a license on FRAND terms. Counsel for InterDigital recently conceded as much, acknowledging that ZTE seeks to license InterDigital's patents on FRAND terms. *See* Ex. 22, Excerpt of July 12, 2013 Hrg. Tr. at 71:2-8. Under these circumstances, "a forum must exist to resolve honest disputes between the patent holder and implementer as to what in fact constitutes a RAND license agreement. Here, the courthouse may be the only such forum." *Microsoft Corp. v. Motorola, Inc.*, 2012 WL 4827743, at *6 (W.D. Wash. 2012).

      21.     In the Google/Motorola consent order, the FTC also required Google/Motorola to dismiss certain pending requests for ITC exclusion orders and prohibited Google/Motorola from obtaining injunctions in the future where a potential licensee had asked a federal court to adjudicate the issue of FRAND-license terms. The FTC consent order also requires Google/Motorola to make an irrevocable offer to

arbitrate FRAND license terms and to keep such offer open for at least 60 days before seeking injunctive relief against a potential licensee.  And, pursuant to the consent order, Google/Motorola's arbitration offer cannot impose conditions on the proposed arbitration other than a requirement that: (i) any license contain a scope of use limitation that limits the license to practicing the relevant standards; and (ii) the potential licensee be required to tender some form of security for potential royalty payments where appropriate.

RLF1 9283408v.1



RLF1 9283408v.1

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

███████ InterDigital's Chief Executive Officer, Bill Merritt, has conceded publicly in an investor conference call that InterDigital seeks ITC exclusion orders not because it desires the remedy of an exclusion order but because it desires the leverage that such an exclusion order creates in negotiations, stating that "ultimately, [InterDigital's] objective is actually not to secure exclusion. . . .  [A]gain, we are not looking to stop product shipments.  What we are looking to do is just get compensated."  Ex. 25, InterDigital Investor Call Tr., at H868_00097325. ███████████████████████████████

█████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████ This is the textbook definition of patent hold-up – a bad faith practice condemned by the FTC,

48

United States Department of Justice, United States Patent and Trademark Office and European competition law authorities and the very practice that FRAND licensing commitments are designed to remedy.

25.     The reason that companies like InterDigital can opportunistically use FRAND-encumbered patents to pursue exclusion orders at the ITC and the resulting leverage from such exclusion orders is that the ITC views its mandate from Congress under 19 USC § 337 very broadly and has not, to date, recognized a FRAND licensing commitment as a defense to an ITC action.  In several recent ITC decisions, the ITC has made it clear that any contractual commitment short of an actual complete and executed license agreement will not shield a respondent in an ITC case from an exclusion order no matter how willing the respondent is to take a license on FRAND terms. For example, in a recently issued Initial Determination in the 800 ITC investigation initiated by InterDigital against ZTE, the ALJ found that "[i]f a violation is found, Section 337 gives the Commission authority to exclude the articles that infringe valid and enforceable US patents . . . . The statute makes no distinction between patents that have or have not been declared essential to a standard." Ex. 27, Initial Determination, Inv. No. ITC 337-TA-800, at 423.[2]

---

[2] On August 3, 2013, the Executive Office of the President, by and through the United States Trade Representative ("USTR"), issued a disapproval of the ITC's exclusion order prohibiting the importation of consumer goods, including handsets, in another ITC investigation involving standards essential patents, 337-TA-794. Ex. 45, Aug. 3, 2013 USTR Disapproval Letter. In that disapproval letter, USTR emphasized the importance to U.S. consumers of voluntary, consensus-based standards set by standards developing organizations ("SDO"). Id. at 2. USTR indicated that it "strongly share[s]" the substantial concerns raised by the Department of Justice and the United States Patent and Trademark Office about the "potential harms that can result from owners of standards essential

26.     Because the ITC is an administrative agency with limited jurisdiction, it has no authority to determine FRAND license terms for the parties, to remedy a breach of a FRAND licensing commitment, or to put a FRAND license in place between the parties.  That is why willing licensees like ZTE facing potential ITC exclusion orders must resort to federal district court actions to address breaches of FRAND licensing commitments and to conclusively set FRAND license terms *before and not after such an exclusion order is issued*.  If an exclusion order is issued by the ITC on a SEP and is not overturned by the President of the United States during a 60 day Presidential review period, the exclusion order automatically obligates the United States Customs and Border Patrol to block the respondent in the ITC investigation from importing standards-compliant products into the United States without any further action on the patent owner's part.  Although a respondent like ZTE would be entitled to appeal an ITC exclusion order to the Federal Circuit, there is no guarantee of a stay pending appeal and, in the past, such stays have been very rarely granted.

27.     The effect on ZTE's business in the United States from an ITC exclusion order would be disastrous since ZTE imports from abroad all of the 3G and 4G smartphones and other cellular devices that its sells in the United States.  As a result, absent relief from a federal district court enforcing a patent owner's FRAND licensing commitments, ZTE's options would be limited to (i) paying whatever royalties InterDigital demands in order to get relief from an ITC exclusion order or (ii) foregoing the U.S. market.

---

patents … gaining undue leverage and engaging in "patent hold-up" through injunctions. Id. The effect of the disapproval is that the exclusion order (and a cease and desist order) issued by the Commission did not go into effect.

28.     InterDigital has followed its ITC playbook to the letter with ZTE.
InterDigital has pursued two separate ITC investigations against ZTE using FRAND-
encumbered patents that InterDigital declared as essential or potentially essential to the
UMTS and CDMA2000 3G cellular telecommunications standards and the 4G LTE
cellular telecommunications standards.  In each instance, InterDigital's allegations of
infringement were based solely on compliance with the relevant 3G or 4G cellular
standards (i.e., InterDigital took the position before the ITC that the patents were
essential to the standard).

29.     The parties' license negotiations are described in more detail below but, at
the time InterDigital filed its first ITC action against ZTE in July 2011, ███████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

30.     In July 2011, InterDigital commenced an ITC investigation (337-TA-800)
against ZTE, asserting seven FRAND-encumbered 3G patents: U.S. Patent Nos.
7,706,830; 8,009,636; 7,502,406; 7,706,332; 7,970,127; 7,536,013; and 7,616,970.[3]  In

---

[3] See e.g., Ex. 43, Sept. 14, 2009 Declarations to ETSI, at IDC868ITC50159690 ('830 &
'636 patents), IDC868ITC50159694 ('332 patent), IDC868ITC50159696 ('406 patent),
IDC868ITC50159707 ('013 patent), IDC868ITC50159708 ('013 patent); Ex. 44, Sept.
16, 2010, Declarations to ETSI, at IDC868ITC50151869 ('970 patent).

June of this year, the administrative law judge in the 800 investigation ultimately

concluded that the patents InterDigital asserted in the 800 investigation were (i) invalid,

(ii) not infringed by ZTE or (iii) both invalid and not infringed.  Implicit in the ALJ's

determination of non-infringement with respect to 6 of the 7 asserted patents is that none

of the claims of these patents, as properly construed, are essential to any CDMA2000 or

WCDMA telecommunications standard.

     31.    InterDigital commenced a second ITC investigation (337-TA-868) against

ZTE in January 2013 asserting two additional FRAND-encumbered 3G patents, U.S.

Patent Nos. 7,190,966 and 7,286,847,  as well as a third FRAND-encumbered patent

related to 4G, U.S. Patent No. 7,941,151.[4]  In the time between commencing the 800

investigation and the 868 investigation against ZTE, ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  The patents

asserted in the 800 ITC Investigation and 868 ITC Investigation are herein referred to

collectively as the "Combined Asserted Patents."[5]

---

[4] *See e.g.,* Ex.43, Sept. 14, 2009 Declarations to ETSI, at IDC868ITC50159690 ('966 and
'847 patents); Ex. 44, Sept. 16, 2010, Declarations to ETSI, at IDC868ITC50151939
('151 patent).

[5] All of the Combined Asserted Patents have been declared essential to the 3G WCDMA
standard except for the '151 patent (declared essential to the 4G LTE standard), and the
'970 patent (declared essential to the GERAN standard).  *See supra,* n. 2, 3. ██████
████████████████████████████████████████████████

32. 

33. ████████████████████████████████████████████████

████████████████████████████████████ InterDigital has also opposed ZTE's attempts to have FRAND license terms set for InterDigital's FRAND-encumbered U.S. patents in this court. InterDigital's refusal to license its U.S. SEPs absent a worldwide, portfolio license is strategic.  It allows InterDigital to use its actions before the US ITC to leverage a worldwide license at higher than FRAND rates.

34. In fact, patents by definition are territorial and ZTE is entitled to a license to InterDigital's U.S. declared essential patents irrespective of InterDigital's patents abroad.  Moreover, because FRAND rates are reflect the value of the patents and patents are territorial, FRAND rates may vary by country.  Any "worldwide rate" – even if a worldwide rate is appropriate under FRAND commitments – would need to be a blend of FRAND rates in different jurisdictions, reflecting a weighted average based on the jurisdictions in which the products are sold.  For example, Huawei has litigated with InterDigital over the appropriate FRAND license terms for InterDigital's Chinese

████████████████████████████████████

FRAND-encumbered patents.  A Chinese court concluded that the FRAND rate for InterDigital's 2G, 3G and 4G Chinese patents is 0.019 percent of the sales price of each handset sold.  China is by far ZTE's largest market in terms of sales.  ZTE is entitled to a license at FRAND rates in China and application of the 0.019% rate to China sales would drive a "blended" worldwide rate significantly lower or, in the alternative, require ZTE to pay exorbitant rates in non-Chinese markets, such as the U.S., to compensate for the low FRAND rate in China.

35. ████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████

36.     These counterclaims are the only mechanism that ZTE has to 1) conclusively resolve its disagreement with InterDigital over the scope of InterDigital's FRAND licensing obligations, 2) establish FRAND license terms for a license to the Combined Asserted Patents and 3) stop InterDigital's abusive use of ITC proceedings in contravention of its FRAND licensing commitments.  ██████████████████
███████████████████████████████████████
███████████████████████████████████████



## FACTUAL BACKGROUND

**1.    The Role of Standard Setting Organizations.**

37.    InterDigital's contractual agreements to let manufacturers like ZTE practice declared-essential patents including the Combined Asserted Patents under a license on FRAND terms arise, in part, out of its membership in ETSI, a European SSO for wireless technologies, as well as its membership in the ITU, the United Nations' agency for information and communication technologies.  Mobile phones are sophisticated electronic devices that function by communicating with a network of cellular base stations operated by wireless carriers like AT&T and T-Mobile in the United States.  For a mobile phone to have any value to a consumer, each component of a cellular network must be capable of working with all the other components, regardless of which company made the component.  Interoperability of mobile phones is crucial for their success, because consumers would cease buying mobile phones if a ZTE mobile phone could not communicate with a cellular base station manufactured by Ericsson or Nortel.

38.    The purpose of SSOs such as ETSI and the ITU is to allow companies to come together and agree on ways to make their products interoperable.  To do so,

55

members work together to develop technical "standards" – agreed-upon protocols that create a common design for a technical function.  If a mobile phone manufacturer follows a given standard, any standard-compliant mobile phone should successfully communicate with any other standard-compliant mobile phone or any standard-compliant network equipment utilized by the wireless carrier.  Only if each component follows the applicable standards will the components work seamlessly with each other.  Patents that are necessary to the proper functioning of the standard are known as "essential" patents.

39.     Despite the many benefits of standardization, it also carries risks.  It is difficult and costly to agree on and implement a new standard.  Once a standard has been agreed upon, any company that owns a patent that is truly essential to the standard suddenly has significant market power.  The reason is simple: if a company wants to manufacture a standard-compliant product, it would likely need to use patents that are essential to the standard.  If the owner of an essential patent were to potentially block manufacturers of standard-compliant products with an injunction, then the patent owner could effectively "hold up" an entire industry and demand unreasonably high royalty rates, taking advantage of the high cost of switching to another standard and the sunk costs of investing in the standard in addition to the reasonable value of the patent.  Moreover, once a patented technology is included in the standard, the owner of that patent suddenly has access to a much larger base of licensees from which to collect royalties, namely every company that wants to manufacture a standard-compliant product.  If there were no standardization, and technical solutions were fragmented among various competing technologies, then a patent holder would only receive royalties

56

from manufacturers that chose to use the patent holder's proprietary and patented

technology.

40.     Seeking to avoid the hold-up risk, SSOs have adopted various mechanisms

to ensure that patent litigation – and more specifically, potential injunctions – do not

cripple development and use of their standards.  The goal of these mechanisms is set forth

in Article 3.1 of the ETSI IPR policy:

> It is ETSI's objective to create STANDARDS and
> TECHNICAL SPECIFICATIONS that are based on
> solutions which best meet the technical objectives of the
> European telecommunications sector, as defined by the
> General Assembly. In order to further this objective the
> ETSI IPR POLICY seeks to reduce the risk to ETSI,
> MEMBERS, and others applying ETSI STANDARDS and
> TECHNICAL SPECIFICATIONS, that investment in the
> preparation, adoption and application of STANDARDS
> could be wasted as a result of an ESSENTIAL IPR for a
> STANDARD or TECHNICAL SPECIFICATION being
> unavailable. In achieving this objective, the ETSI IPR
> POLICY seeks a balance between the needs of
> standardization for public use in the field of
> telecommunications and the rights of the owners of IPRs.

41.     ETSI adopted a system with both mandatory and voluntary components.

Under the mandatory component, ETSI requires members to take reasonable steps,

especially during the development of a standard, to inform ETSI of essential IPRs in a

timely fashion. Article 4.1 of the ETSI IPR Policy specifically provides that:

> [E]ach MEMBER shall use its reasonable endeavors, in
> particular during the development of a STANDARD or
> TECHNICAL SPECIFICATION where it participates, to
> inform ETSI of ESSENTIAL IPRs in a timely fashion.  In
> particular, a MEMBER submitting a technical proposal for
> a STANDARD or TECHNICAL SPECIFICATION shall,
> on a bona fide basis, draw the attention of ETSI to any of

57

that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

42.    Under the voluntary portion of ETSI's IPR policy, ETSI requests (but does not require) that a holder of a declared-essential patent make a voluntary – yet binding – commitment that the patent holder will grant a license to its declared-essential patent on FRAND terms.  This voluntary request by ETSI for a binding commitment from the patent holder is set out in Section 6.1 of the ETSI IPR Policy, which provides as follows:

> When an essential IPR relating to a particular standard or technical specification is brought to the attention of ETSI, the director-general of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory terms and conditions . . .

43.    Because the FRAND licensing requirement is voluntary and not mandatory, the ETSI IPR Policy provides for those instances where a patent holder refuses to permit manufacturers to use its declared-essential patent or is unwilling to limit its terms for use of the patent to FRAND terms.  The ETSI IPR Policy takes such refusals seriously and requires that the ETSI General Assembly search for a "viable alternative technology" which "is not blocked by that IPR" and which "satisfies ETSI's requirements."  ETSI IPR Policy § 8.1.1.

44.    Similarly, the ITU's Common Patent Policy requires that holders of declared essential patents must provide declarations that they are willing to negotiate licenses either "free of charge" or "on a non-discriminatory basis on reasonable terms and conditions."  Where a patent holder refuses to make such a declaration and indicates that

it is not willing to license under FRAND terms, "the Recommendation / Deliverable shall

not include provisions depending on the patent."

45.     InterDigital has declared to ETSI and/or the ITU that the Combined

Asserted Patents are essential to ETSI's or the ITU's second generation, third generation,

or fourth generation standards by providing written, irrevocable undertakings to permit

manufacturers of standard-compliant products (like ZTE) to practice its declared-

essential patents including the Combined Asserted Patents on a FRAND basis.

InterDigital has made similar declarations for a number of InterDigital's other U.S.

patents.

## 2.   Committing to License on FRAND Terms Creates a Contractual Obligation.

46.     When a patentee such as InterDigital voluntarily commits to allow

manufacturers willing to take a license on FRAND terms to practice its declared-essential

patents under FRAND terms and conditions, it is not simply making a symbolic gesture.

To the contrary, agreeing to permit use of the declared-essential patent on FRAND terms

creates clear and legally enforceable contractual rights and obligations.

47.     ETSI is based in Sophia-Antipolis, France.  French law governs the

interpretation of the ETSI IPR Policy and contractual rights and obligations arising

therefrom.  According to Article 12 of the ETSI IPR Policy:

> The POLICY shall be governed by the laws of France.
> However, no MEMBER shall be obliged by the POLICY to
> commit a breach of the laws or regulations of its country or
> to act against supranational laws or regulations applicable
> to its country insofar as derogation by agreement between
> parties is not permitted by such laws.  Any right granted to,

and any obligation imposed on, a MEMBER which derives
from French law and which are not already contained in the
national or supranational law applicable to that MEMBER
is to be understood as being solely contractual in nature.

48.     In addition, certain IPR Information Statements and Licensing

Declarations submitted by InterDigital to ETSI for its declared-essential patents

specifically state on their face that "the construction, validity and performance of this IPR

information statement and licensing declaration shall be governed by the laws of France."

49.     Under French law, InterDigital's written undertaking to ETSI creates a

*stipulation pour autrui* — a stipulation in favor of a third party.  In a *stipulation pour*

*autrui*, the promisor commits to the stipulator to grant a right to one or more

beneficiaries.  The promisor becomes contractually bound to the stipulator as soon as it

makes its promise, and may not later withdraw its stipulation.

50.     In the ETSI context, a patent holder who makes a written undertaking to

ETSI stating that it is prepared to grant irrevocable licenses on FRAND terms is making a

contractual commitment.  Specifically, by submitting a FRAND undertaking to ETSI, a

patent holder becomes (i) contractually bound to ETSI; (ii) for the benefit of third party

beneficiaries; (iii) to license its declared-essential patent on FRAND terms in accordance

with Article 6.1 of the ETSI IPR Policy.  Under the governing French law, InterDigital's

execution of the ETSI FRAND undertaking created a binding *stipulation pour autrui*

between itself, the stipulator or receiver of the promise (here, ETSI), and ultimately, upon

acceptance, the beneficiaries of the undertaking (here, ZTE).

51.     Having irrevocably agreed to license its declared-essential patents

including the Combined Asserted Patents on FRAND terms and conditions to

manufacturers of standard-compliant products, InterDigital may not, consistent with its

agreements, prohibit a manufacturer of standard-compliant products like ZTE that is

willing to take a license for any of InterDigital's patents that are valid, essential, and

actually used by ZTE from practicing its declared-essential patents, including the

Combined Asserted Patents, in standard-compliant products.  Further, InterDigital is

obligated to actually conclude a license with a willing licensee such as ZTE on FRAND

terms.

52.     Similarly, in the ITU context, a patent holder who makes a written

declaration to the ITU stating that it is prepared to grant licenses on FRAND terms makes

a contractual commitment for the benefit of potential willing licensees, who are third-

party beneficiaries to that commitment.  A patent holder making such a declaration to the

ITU becomes (i) contractually bound to the ITU; (ii) for the benefit of third party

beneficiaries; (iii) to license its declared-essential patent on FRAND terms.  Several

federal courts have determined that declarations do constitute contractual commitments to

license the declared-essential patents on FRAND terms, and that members of the ITU are

third-party beneficiaries to such contracts.  *See Microsoft Corp. v. Motorola, Inc.*, 854 F.

Supp. 2d 993, 999 (W.D. Wash. 2012).  ); *see also Microsoft Corp. v. Motorola, Inc.*, 696

F.3d 872, 884 (9th Cir. 2012) (holding that the "district court's conclusions that

Motorola's RAND declarations to the ITU created a contract enforceable by Microsoft as

a third-party beneficiary …and that this contract governs in some way what actions

Motorola may take to enforce its ITU standard-essential patents … were not legally

erroneous"); *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178bbc, 2012 WL

3289835, at *21-22 (W.D. Wis. Aug. 10, 2012).

61

**3.  The Negotiation History between InterDigital and ZTE.**

53.  ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

54.  In the midst of negotiations, InterDigital surprised ZTE by filing suit at the

ITC.  *See* July 26, 2011 Compl., Inv. No. 337-TA-800. ████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████  Rather than engage in good faith

discussions with ZTE, InterDigital opted to apply the pressure of a threatened exclusion

order.

55. ████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████

56. ██████████████████████████████████
██████████████████████████████
██████████████████████████████████████
████████████████████████████████████
██████████████████████████



████████████████

57. ██████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
██████████████████████████████████

63

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

58.  ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

59.  ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████

60.  ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

64



62.     On January 2, 2013, InterDigital filed a second set of lawsuits, including the present action against ZTE and others.  *See* D.I. 1, Compl.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

63.     ██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████[7]

██████████████████████████████████████████

██████████████████████████████████████████



RLF1 9283408v.1

64.

65.

67

**4.  ZTE is a Willing Licensee.**

66.

67.     In the Google order, the FTC identified the exceedingly narrow category of licensees against which Google could pursue injunctive relief.  As a general matter, under the FTC order, Google cannot pursue injunctions or exclusion orders against potential licensees until it has offered first to arbitrate FRAND license terms with the

68

potential licensees.  A narrow exception permits Google to pursue injunctions or exclusion orders only against licensees that: (i) are outside of the jurisdiction of United States courts; (ii) state in writing or sworn testimony that they would not license the FRAND-committed patent(s) on any terms (and this expressly excluded disputes by the licensee over "validity, value, Infringement or Essentiality" of a FRAND-committed patent); (iii) refuse to enter into a license agreement covering FRAND committed patents on terms set by a court or in an arbitration; or (iv) fail to provide specific written confirmation to the patent holder regarding a willingness to actually take a license on FRAND terms.  *See* Decision and Order, FTC File No. 1210120, In the Matter of Motorola Mobility LLC and Google Inc.

68.     InterDigital cannot say that ZTE is an unwilling licensee because it simply is not true.  Indeed, before this Court, counsel for InterDigital conceded that ZTE seeks a license on FRAND terms.  *See* Ex. 22, Excerpt of July 12, 2013 Hrg. Tr. at 71:2-12. █████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Under the paradigm established in the FTC consent order, none of these things render ZTE an unwilling licensee or make it appropriate for InterDigital to seek not one but two separate exclusion orders against ZTE.

## 5.  InterDigital's Offers to ZTE Were Not FRAND and Were Made in Bad Faith.

69.     InterDigital's offers to ZTE were not FRAND for several reasons including but not limited to:  (1) the offers did not reflect a reasonable royalty, but rather

69

hold-up value based on the threat of injunctive relief because ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

      70.     Put more simply, InterDigital has negotiated and continues to negotiate with ZTE in bad faith.  InterDigital's licensing offers do not represent a fair and reasonable valuation of InterDigital's patent portfolio but instead represent an attempt to leverage the threat of an exclusion order at the ITC to extort an exorbitant royalty fee from ZTE. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

70



71.

RLF1 9283408v.1



72. ██████████████████████████████
███████████████████████████████████████
█████████████████████████

73. ████████████████████████████████
███████████████████████████████
█████████████████████████████████████
██████████████████████████████

72

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████

**6. InterDigital Has Breached Its FRAND Obligations.**

74.     Notwithstanding InterDigital's declarations of essentiality, and implicit and explicit FRAND commitments, InterDigital has failed to negotiate in good faith and offer and grant a FRAND license to ZTE with respect to potentially essential patents in its portfolio - including the Combined Asserted Patents.

75.     Additionally, InterDigital initiated the ITC Proceedings, by which InterDigital seeks to harm irreparably ZTE's substantial business by seeking to exclude its products and/or to extract unfair and unreasonable license terms.

**COUNT I**
**BREACH OF CONTRACT**

76.     ZTE incorporates the allegations set forth in paragraphs 1-75 above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

77.     The conduct of InterDigital as alleged above constitutes breach of contract.

78.     As set forth above, InterDigital entered into express or implied contracts with ETSI, 3GPP, ITU, their members, and manufactures and sellers of products designed to be compliant with standards adopted by these SSOs, including ZTE, to negotiate in good faith and grant licenses to its purportedly essential IPR on FRAND terms.

73

79.     InterDigital has breached and continues to breach its contracts by failing to negotiate in good faith.  Separately, InterDigital has breached and continues to breach its contracts by failing to license purportedly essential IPR, including the ITC Asserted Patents, on FRAND terms.  *See Microsoft Corp. v. Motorola Mobility, Inc.*, C10-1823JLR , Dkt. No. 335 at 18-19 (W.D. Wash. June 6, 2012) (holding that standard implementer is not even required to negotiate in good faith as a condition precedent to SEP holder's obligation to grant licenses on FRAND terms).

80.     As a result of these multiple contractual breaches, ZTE has been injured, including in its business and property.  ZTE has been forced to expend resources resolving this licensing dispute, and is threatened, in particular, with irreparable loss of profits, loss of customers and potential customers, loss of goodwill and product image, and uncertainty among customers and potential customers.

81.     Among other remedies, ZTE seeks specific performance of the contract entered into by InterDigital with ETSI and other SSOs.

## COUNT II
## BREACH OF CONTRACT—THIRD PARTY BENEFICIARY

82.     ZTE incorporates the allegations set forth in paragraphs 1-81, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

83.     As set forth above, InterDigital entered into express or implied contracts with ETSI, 3GPP, ITU, and their members, to negotiate in good faith and grant licenses to its purportedly essential IPR on FRAND terms.

84.     InterDigital's contracts with these SSOs, and in particular InterDigital's commitments in the contracts to grant applicants licenses to its purportedly essential IPR

on FRAND terms evince a clear intent that the contracts benefit ZTE and other third parties who might require a license to the Asserted Patents.

85.     These same contractual commitments create a duty on behalf of InterDigital to license its Asserted Patents on fair, reasonable, and non-discriminatory terms.

86.     It is only by InterDigital's fulfilling its promise to license the Asserted Patents on FRAND terms that ZTE will receive the intended benefit of being able to practice the implicated standards free from unreasonably high and discriminatory licensing demands.

87.     InterDigital has breached and continues to breach its contracts by failing to negotiate in good faith.  Separately, InterDigital has breached and continues to breach its contracts by failing to license purportedly essential IPR, including the ITC Asserted Patents, to the contracts' third-party beneficiary, ZTE, on FRAND terms.

88.     As a result of these multiple contractual breaches, ZTE has been injured, including in its business and property.  ZTE has been forced to expend resources resolving this licensing dispute, and is threatened, in particular, with irreparable loss of profits, loss of customers and potential customers, loss of goodwill and product image, and uncertainty among customers and potential customers.

89.     Among other remedies, ZTE seeks specific performance of the contract entered into by InterDigital with ETSI and other SSOs.

**COUNT III**
**DECLARATORY RELIEF:  INTERDIGITAL**
**HAS NOT OFFERED LICENSES ON FRAND TERMS**

75

90.     ZTE incorporates the allegations set forth in paragraphs 1-89, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

91.     There is an actual controversy between the parties concerning whether the terms on which InterDigital has offered to license its purported essential patents are fair, reasonable, and nondiscriminatory.

92.     The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

93.     ZTE is entitled to a declaratory judgment that InterDigital has not to date offered it licenses on FRAND terms.

## COUNT IV
## DECLARATORY RELIEF:  DETERMINATION OF FRAND LICENSE

94.     ZTE incorporates the allegations set forth in paragraphs 1-93, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

95.     There is an actual controversy between the parties concerning FRAND terms for InterDigital's United States patents that have been declared essential to a standard used by any of the products accused in the earlier filed cases or this action.  For example, throughout negotiations and litigation between the parties, InterDigital has asserted that it has offered FRAND license terms and ZTE has asserted that InterDigital's offers do not constitute FRAND license terms.  Similarly, ZTE has asserted that its counterproposals to InterDigital comprise FRAND terms and InterDigital asserts that ZTE's counterproposals do not comprise FRAND terms.  *See, e.g.*, ¶53-54.

96.     The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  The declaration of a FRAND rate for a license to standard essential patents is properly is properly decided by a court confronted by parties

unable to agree on FRAND terms and has been accomplished previously. *See Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217 (W.D. Wash. April 25, 2013) (setting FRAND rate and FRAND rate range for portfolio of standard essential patents). Moreover, at least two other district courts are currently scheduled to set a FRAND rate. *See Realtek Semiconductor Corp. v. LSI Corp.*, --- F. Supp. 2d ---, 2013 WL 2181717, at *10 (N.D. Cal. May 20, 2013) (granting preliminary injunction regarding related ITC action until the court determines patent holder's RAND obligations and patent holder has complied therewith).

97.     ZTE is entitled to a declaratory judgment determining an appropriate FRAND royalty for InterDigital's United States patents that have been declared essential to a standard used by any of the products accused in the earlier filed cases or this action.

## COUNT V
## NONINFRINGEMENT OF THE ASSERTED PATENTS

98.     ZTE incorporates the allegations set forth in paragraphs 1–97, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

99.     An actual controversy exists between the parties with respect to infringement of the Asserted Patents because InterDigital has brought this action against ZTE alleging that ZTE infringes the Asserted Patents.

100.     ZTE has not and is not now infringing, contributorily infringing, or inducing infringement of the Asserted Patents.

101.     ZTE is entitled to a judgment that ZTE does not infringe any claims of the Asserted Patents.

## COUNT VI
## INVALIDITY OF THE ASSERTED PATENTS

102.    ZTE incorporates the allegations set forth in paragraphs 1–101, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

103.    An actual controversy exists between the parties with respect to invalidity of the Asserted Patents because InterDigital has brought this action against ZTE alleging that ZTE infringes the Asserted Patents.

104.    The claims of the Asserted Patents are invalid under Section 101 of Title 35 of the United States Code as directed to non-statutory subject matter.

105.    The claims of the Asserted Patents are invalid under Sections 102 and/or 103 of Title 35 of the United States Code as anticipated or obvious in light of the prior art.

106.    The claims of the Asserted Patents are also invalid under the requirements of paragraph 1 of Section 112 of Title 35 of the United States Code due to a lack of written description, failure to particularly point out and distinctly claim the subject matters which are regarded as the alleged inventions, and/or failure to set forth written descriptions sufficient to enable any person skilled in the art to make and use the alleged inventions. In addition, the claims of the Asserted Patents are invalid under paragraph 2 of Section 112 of Title 35 of the United States Code because those claims are indefinite in that they contain ambiguous language and/or functional limitations that prevent a person skilled in the art from determining their full scope or meaning.

107.    ZTE is entitled to a judgment that the claims of the Asserted Patents are invalid.

RLF1 9283408v.1

**COUNT VII**
**UNENFORCEABILITY OF THE ASSERTED PATENTS**

108.    ZTE incorporates the allegations set forth in paragraphs 1–107, above, and in its Answer and Affirmative Defenses to InterDigital's Amended Complaint.

109.    An actual controversy exists between the parties with respect to unenforceability of the Asserted Patents because InterDigital has brought this action against ZTE alleging that ZTE infringes the Asserted Patents.

110.    The Asserted Patents are unenforceable under one or more of the equitable doctrines of patent misuse, unclean hands, equitable estoppel, promissory estoppel, implied license, and inequitable conduct.

111.    ZTE is entitled to a judgment that the Asserted Patents are unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, ZTE respectfully prays for relief as follows:

(a)    A judgment that InterDigital has breached its contracts with ZTE by failing to negotiate in good faith and/or grant licenses on FRAND terms to purported essential IPR, including the Asserted Patents, ordering specific performance of these contracts, and awarding appropriate damages in an amount to be proven at trial;

(b)    A judgment that InterDigital has breached its contracts with the SSOs, harming ZTE as third-party beneficiary of those contracts, by failing to negotiate in good faith and/or grant licenses on FRAND terms to purported essential IPR, including the Asserted Patents, ordering specific performance of these contracts, and awarding appropriate damages in an amount to be proven at trial;

79

RLF1 9283408v.1

(c)    A declaratory judgment that InterDigital has not to date offered ZTE licenses on FRAND terms;

(d)    A declaratory judgment setting an appropriate FRAND royalty to license InterDigital's United States patents, including the ITC Asserted Patents, that have been declared essential to a standard used by any products accused in the earlier filed case or in this action;

(e)    A declaratory judgment that ZTE does not infringe any claim of the Asserted Patents;

(f)    A declaratory judgment that the claims of the Asserted Patents are invalid;

(g)    A declaratory judgment that the Asserted Patents are unenforceable;

(h)    Awarding to ZTE the costs and disbursements of the action, including reasonable attorneys' fees; and

(i)    Such other relief as the Court may deem just and equitable.

<table>
<tr><td></td><td>___<i>/s/ Kelly E. Farnan</i>_____</td></tr>
</table>

|  |  |
|---|---|
|  | */s/ Kelly E. Farnan* |
|  | Kelly E. Farnan (#4395) |
| OF COUNSEL**:** | Farnan@rlf.com |
|  | Travis S. Hunter (#5350) |
| Brinks Hofer Gilson & Lione | Hunter@rlf.com |
| NBC Tower, Suite 3600 | Richards, Layton & Finger, P.A. |
| 455 North Cityfront Plaza Drive | One Rodney Square |
| Chicago, IL  60611 | 920 N. King St. |
| (312) 321-4200 | Wilmington, DE 19801 |
|  |  |
| Dated:  August 27, 2013 | *Attorneys for Defendant ZTE Corp.* |

RLF1 9283408v.1